

1994 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

7-27-1994

# United States of America v. Reilly

Precedential or Non-Precedential:

Docket 93-7671

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1994

Recommended Citation

"United States of America v. Reilly" (1994). *1994 Decisions.* Paper 94.
http://digitalcommons.law.villanova.edu/thirdcircuit_1994/94

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1994 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT


Nos. 93-7671, 93-7672, 93-7673, 93-7684,
93-7685, 93-7686, 93-7694


UNITED STATES OF AMERICA,

v.

WILLIAM P. REILLY,

Appellant


UNITED STATES OF AMERICA,

v.

JOHN PATRICK DOWD,

Appellant


On Appeal from the United States District Court
for the District of Delaware
(D.C. Crim. Nos. 92-00053-1, 93-00008,
93-00010, 92-00053-2)


Argued May 2, 1994

BEFORE:  GREENBERG and GARTH, Circuit Judges,
and ROBRENO, District Judge*

(Filed: July 28, 1994)


1

Lois J. Schiffer
Acting Assistant Attorney
General

Howard P. Stewart
Christina E. Steck
David C. Shilton (argued)
J. Carol Williams
United States Department of
Justice
P.O. Box 23795
L'Enfant Plaza Station
Washington, DC 20026

Attorneys for appellee

Marc B. Tucker (argued)
Randolph K. Herndon
Daniel V. Folt
Andre G. Bouchard
Skadden, Arps, Slate, Meagher &
Flom
One Rodney Square
P.O. Box 636
Wilmington, DE 19899

Attorneys for appellant
William P. Reilly

Andrew L. Frey (argued)
Lawrence S. Robbins
John J. Sullivan
Dorrann E. Banks
Mayer, Brown & Platt
2000 Pennsylvania Ave., N.W.
Washington, DC 20006

Attorneys for appellant
John Patrick Dowd

OPINION OF THE COURT


GREENBERG, Circuit Judge.


I. FACTUAL AND PROCEDURAL HISTORY

A. <u>Factual History</u>

This is an appeal from judgments of conviction and sentence entered following a jury trial in the United States District Court for the District of Delaware.[0] The appellants are John Patrick Dowd, who was convicted of knowingly making a false declaration under oath, 18 U.S.C. § 1623(a), and William P. Reilly, who was convicted of knowingly making false declarations under oath, 18 U.S.C. § 1623(a), and of transporting incinerator ash from the United States for the purpose of dumping it into the ocean, 33 U.S.C. § 1411(a). The charges against Dowd and Reilly arose from three sources: a Delaware indictment alleging that they knowingly made false material declarations before a grand jury; a Delaware information charging Reilly with the dumping violation; and a Pennsylvania indictment alleging that Reilly knowingly made false material declarations before a district court during a contempt hearing. The Pennsylvania indictment was transferred to the District of Delaware for consolidation and trial. The district court had subject matter jurisdiction pursuant to 18 U.S.C. § 3231. We have jurisdiction under 28 U.S.C. § 1291 and 18 U.S.C. § 3742(a).

Dowd and Reilly were respectively the president and vice president of Coastal Carriers Corporation, which was based in Annapolis, Maryland. Coastal Carriers acted as an agent for the Amalgamated Shipping Corporation, a Bahamas corporation whose

---

[0]We refer to the appendices as follows: (1) Dowd's appendix is D. app.; (2) Reilly's appendix is R. app.; (3) the government's appendix is U.S. app. We refer to the briefs in a similar way.

4

president and vice-president, respectively, were Robert Cordes and Henry Dowd, John Patrick Dowd's father. Cordes was also president of several other corporations including MASCO, Lily Navigation, and Romo Shipping Corporation. In early 1986, John Patrick Dowd and Reilly entered into negotiations with Joseph Paolino & Sons, Inc., a contractor with the City of Philadelphia, leading to Paolino and Amalgamated signing a contract on June 23, 1986, in which Amalgamated agreed to transport and dispose of incinerator ash residue produced by the city.

Subsequently, Amalgamated entered into a two-year time charter with Lily Navigation for one of Lily's ships, the Khian Sea. In August 1986, Paolino loaded approximately 13,500 tons of incinerator ash into the holds of the Khian Sea, while the ship was docked at Girard Point in Philadelphia. See U.S. app. at 249-251. Later that month, the Khian Sea left Philadelphia for the Bahamas where Amalgamated intended to dispose of the ash. However, before the Khian Sea reached the Bahamas, that country denied Amalgamated permission to dispose of the ash. Apparently, the Khian Sea then sailed around the Caribbean for more than a year while a disposal site was sought.

In November 1987, Amalgamated had not yet found a site for the ash, and the ship was anchored in Puerto Cortes, Honduras. At that point, the captain of the Khian Sea left the ship, and Reilly hired Arturo Fuentes, a captain who lived in Puerto Cortes, to replace him. Reilly directed Fuentes to take the ship to Haiti, where the ash would be off-loaded. After the Khian Sea arrived in Haiti, its crew began off-loading the ash

5

but the Haitian military authorities interrupted the operation and required the ship to leave. At that time, more than half of the original ash remained on the ship.

Fuentes testified that Reilly then instructed him to take the ship to Ocean Cay in the Bahamas to pick up a small bulldozer called a "bobcat." See R. app. at 663-64. After picking up the bulldozer, the Khian Sea went to Ft. Pierce, Florida, where Reilly boarded the ship, and according to Fuentes, promised the ship's officers and crew additional compensation to begin dumping the ash into the ocean while en route to West Africa. Id. at 673-74. The Khian Sea left Ft. Pierce but before it began the dumping, "AMALGAMATED ANNAPOLIS" sent Fuentes a radiotelegram instructing him to "SUSPEND OPERATIONS" and proceed to Philadelphia. Id. at 679-80, 1189. Fuentes received another radiotelegram on February 27, 1988, signed "AMALGAMATED" instructing him to "CALL 301 544 2909 AT 1900 TODAY." Id. at 1192. The phone number was Reilly's home phone number, which Fuentes frequently called to contact Reilly. Id. at 686.

The Khian Sea entered Delaware Bay on March 1, 1988, and anchored at Big Stone Beach. See D. app. at 71. While the ship was anchored there, Paolino and Coastal Carriers engaged in negotiations regarding the disposal of the ash. However, they could not reach an agreement on the price for disposal. See U.S. app. at 3-4. During this period, Reilly boarded the Khian Sea several times, and according to Fuentes, he and Reilly discussed the execution of the dumping plan they had developed in Ft. Pierce. Subsequently, Reilly directed Fuentes to leave for the

6

Atlantic, and the Khian Sea left the Delaware Bay on May 22, 1988, against the orders of the Coast Guard.  See D. app. at 278; R. app. at 699-700, 854; U.S. app. at 5, 239-40.

A few days after the Khian Sea left the Delaware Bay, its crew began dumping the ash into the Atlantic Ocean.  This dumping continued for about two weeks, but stopped when "all the equipment broke down."  See R. app. at 855.  During the two-week period of dumping, Fuentes and Reilly communicated frequently.  See D. app. at 281-92.  Subsequently, in July 1988, the Khian Sea docked in Bijela, Yugoslavia, for repairs.  See R. app. at 856.[0]

Reilly wrote to the American Bureau of Shipping to request that the ship be reclassified inasmuch as it had lost its classification after leaving the Delaware Bay without permission.[0]  However, on August 17, 1988, the Bureau sent a letter to Reilly informing him that its surveyor could not examine the holds because "the vessel remains about half loaded with cargo," see U.S. app. at 259, and thus, the ship only was authorized to sail directly to Manila for completion of the reclassification surveys, id. at 63.

---

[0]While the ship was in Yugoslavia, Lily "sold" the ship and its cargo to Romo Shipping for $10, and the ship was renamed the Felicia.  However, Lily and Romo had the same post office box in Freeport, Bahamas, and, as noted above, both were headed by Robert Cordes.  See R. app. at 1167.  Moreover, Coastal Carriers continued to act as the agent for the ship.  Throughout our opinion, we will refer to the ship as the Khian Sea.
[0]Before a ship can accept commercial cargoes, it must obtain a "classification" certifying that it is seaworthy and able safely to carry certain cargoes.  The ship must be "reclassified" periodically.  See U.S. app. at 34-35.

Reilly met with Fuentes in Yugoslavia, and told him that: (1) Kimon Berbillis, a representative of Romo Shipping, would give him instructions regarding the remainder of the trip; (2) if no country agreed to accept the remaining ash, it would be dumped in the ocean; and (3) they would refer to the ash as "ballast." See D. app. at 299, 304-05. The ship left Yugoslavia and transited the Suez Canal in September 1988. Id. at 300-01. Subsequently, Fuentes received a radiotelegram from Berbillis, stating that Fuentes should arrive in Colombo, Sri Lanka, with only "500 TONS" of ballast, and that Reilly would cable him information he had requested. See R. app. at 1214. The next day, Fuentes received confirmation from Annapolis that the ship should arrive in Colombo with only 500 tons on board. Id. at 1215. In accordance with these instructions, Fuentes dumped all but 500 tons of the remaining ash into the Indian Ocean. Id. at 719-20.

On October 9, 1988, Fuentes received a radiotelegram directing him to proceed to Singapore, instead of to Colombo, see id. at 1216, and on October 15, he received a radiotelegram directing him to dump the remaining 500 tons of ash, id. at 1218. Prior to the ship's arrival in Singapore, Reilly telefaxed a letter to the American Bureau of Shipping, stating that the Khian Sea would arrive in Singapore "for the completion of class work." See U.S. app. at 261. When the ship arrived in Singapore in November 1988, its cargo holds were empty. According to Fuentes, Dowd boarded the ship in Singapore, removed gear that had been used in the dumping operation, see R. app. at 729-30, and told

8

Fuentes to replace the ship's logbook with a falsified logbook, see D. app. 322-25, and to tell any inquiring journalists that the ash had been dumped in a country which could not be revealed, id. at 320. The Khian Sea then proceeded to Shanghai, where it was reclassified. See U.S. app. at 64. Fuentes left the ship at this point, taking copies of radiotelegrams and communication logs with him. See R. app. at 665, 739.

B. Procedural History

Paolino filed suit against Coastal Carriers, Amalgamated, and others, and on June 2, 1988, the United States District Court for the Eastern District of Pennsylvania issued a preliminary injunction, enjoining the defendants, their officers, and their agents from off-loading or disposing of the ash without first providing Paolino with at least three days written notice of the proposed place, manner, and method of disposal. The district court held a contempt hearing on December 15, 1988, to determine if the defendants had violated the preliminary injunction. At the hearing, Reilly was asked, under oath, whether he had "any knowledge . . . as to what happened to the incinerator residue" on board the Khian Sea, or "any knowledge as to the means by which it might be ascertained what happened to the residue." See U.S. app. at 275. Reilly responded "[n]o, sir" to both questions. Id.

In January 1990, Reilly appeared before a federal grand jury for the District of Delaware that was investigating potential ocean dumping violations in connection with the

9

activities of the Khian Sea between September 1986 and December 1988. Id. at 285-403. Reilly was informed that the grand jury was investigating the disposal of ash from the Khian Sea and was advised of his right to leave and seek legal counsel. He then testified that he had no knowledge of what happened to the ash and had not directed anyone to remove the ash from the ship. Id. at 376-81.

Dowd appeared before the same grand jury on February 14, 1990. See U.S. app. at 405-95. Like Reilly, he was informed of the scope of the grand jury's investigation and his rights. Dowd then testified that he did not have "any idea" what happened to the ash on board the Khian Sea. See D. app. at 212-13.

On June 14, 1992, an indictment was returned in the District of Delaware charging Dowd and Reilly with violating 18 U.S.C. § 1623(a) by knowingly making false declarations before the federal grand jury. See R. app. at 49-57. Dowd and Reilly moved to dismiss the indictment, claiming that it did not allege adequately the essential elements of a section 1623(a) violation. United States v. Reilly, 811 F. Supp. 177, 179 (D. Del. 1993). However, the court held that the indictment alleged with sufficient clarity that Dowd and Reilly knowingly made false statements before a grand jury, these statements were material to the grand jury's investigation, and the questions that elicited these false statements were not too vague or ambiguous to support convictions under section 1623(a). 811 F. Supp. at 181.

On January 25, 1993, an indictment was returned in the Eastern District of Pennsylvania charging Reilly with violating

10

18 U.S.C. § 1623(a) by knowingly making false declarations during the contempt hearing.  See R. app. at 62-66.  Finally, on January 28, 1993, an information was filed in the District of Delaware, charging Reilly with violating 33 U.S.C. § 1411(a), by knowingly transporting and causing to be transported material from the United States for the purpose of dumping it into ocean waters. R. app. at 58-61.  The two indictments and the information were consolidated in the District of Delaware.  Prior to trial, Dowd and Reilly unsuccessfully moved to disqualify the prosecutor from prosecuting the case because he had called them as witnesses before the Delaware grand jury.  United States v. Reilly, Crim. Nos. 92-53-JJF, 93-8-JJF, 93-10-JJF, Memorandum Opinion at 9 (D. Del. May 7, 1993).  Following a jury trial from May 17 to June 3, 1993, Reilly was convicted of two counts of making false declarations and one count of dumping, and Dowd was convicted of one count of making a false declaration.

## II. DISCUSSION

### A. Were the radiotelegams authenticated properly?

The Khian Sea communicated with locations on shore by radiotelegram and the district court admitted into evidence 35 of the radiotelegrams that allegedly had been sent to or received by the Khian Sea between December 1987 and December 1988.  See R. app. at 1189-94, 1198-1209, 1212-21, 1226-32.  The district court based its evidentiary decision in part on its conclusion that there was "sufficient circumstantial evidence" to indicate that

11

the radiotelegrams were what the government claimed.  See U.S. app. at 65-67.  Reilly challenges this determination in this appeal.  "We review the district court's ruling as to proper authentication for abuse of discretion."  United States v. McGlory, 968 F.2d 309, 328 (3d Cir.), cert. denied, 113 S.Ct. 415 (1992).[0]

Reilly argues that the district court admitted all of the 35 radiotelegrams into evidence "on a wholesale basis as Mr. Reilly's admissions, irrespective of the very substantial differences among them, irrespective of the fact that most of them indisputably were sent or received by people other than Mr. Reilly[,] . . . and irrespective of the fact that the government did not even attempt to demonstrate, much less succeed in demonstrating, how each radiotelegram was 'authored' or 'adopted' by Mr. Reilly."  See R. br. at 37-38.  Thus, Reilly argues that the district court either failed to exercise its discretion or abused its discretion by admitting the radiotelegrams as Reilly's admissions.  Id. at 38.  Reilly also argues that the government should be "estopped" from asserting "that only a few of the radiotelegrams were sent by Reilly" and that most of the radiotelegrams "were introduced only to show the circumstances in which the few radiotelegrams from Mr. Reilly were sent," see R.

---

[0]Neither Reilly nor the government distinguishes between the evidence before the district court at the time it ruled that the radiotelegrams satisfied the authenticity requirement and the evidence introduced later in the trial.  Thus, we review all of the evidence relevant to authenticity.

12

reply br. at 12-13, because it did not make this argument to the district court, id. at 11.

The government argues that it did not attempt to authenticate all of the 35 radiotelegrams as Reilly's admissions and that the district court did not admit the radiotelegrams on this basis. U.S. br. at 18-19. The government maintains that although it introduced some of the radiotelegrams to "show that Reilly knew about and directed the dumping of the ash into the ocean[,] [o]thers . . . [were not sent or received by Reilly and] were introduced because they interrelate with the incriminating radiotelegrams, establishing the factual context and showing generally that Fuentes was testifying accurately as to the timing and substance of various events." Id. at 19-20. According to the government, the district court concluded that all of the 35 radiotelegrams had been authenticated properly based on "the detailed testimony of Fuentes that the radiotelegrams were communications between Reilly and him, the subject matter of the radiotelegrams, their timing and interconnection with each other, their connection with undisputed evidence of phone calls between Reilly and Fuentes, and Reilly's own admission that he communicated with captain Fuentes by cable and phone." Id. at 18.

We conclude that, contrary to Reilly's allegations, the government did not attempt to authenticate all of the 35 radiotelegrams as Reilly's admissions. See R. app. at 123-29 (Memorandum of the United States in Support of the Admission of Certain Cables and Other Records of the Khian Sea). Moreover,

13

although the district court focused on the connections between the radiotelegrams and Reilly when citing the circumstantial evidence of their authenticity, we do not believe that the district court admitted all of the 35 radiotelegrams as Reilly's admissions.[0] We base this conclusion on the fact that 18 of the 35 radiotelegrams admitted into evidence were sent from the Khian

---

[0] When ruling that the radiotelegrams satisfied the authenticity requirement, the district court stated:

> At the moment, I'm inclined to allow the government to use the messages, and I do it . . . based on my reading of the case law that talks about the level of proof necessary for authenticity . . . they don't have to be perfect in proving it, that your client sent these telexes or the messages and . . . [there is] sufficient circumstantial evidence to . . . [suggest] that they are what the government purports that they should be; that is, that they appear to be from the same location where he was; they appear to include contents of materials or communications that he would know the substance of the communications; and they appear to be in a pattern of communications that would suggest that if Fuentes received them and then acted on them and then responded to them and then received a response again from Reilly, all of which suggests that whoever it was who was sending the messages had knowledge of the transaction and the matters involved.
>
> And I understand there's a risk that the sender may have been someone else other than Reilly. And by admitting them and finding that the government has reasonably satisfied [the] authenticity [requirement], I'm not making a finding that Reilly is absolutely the person who sent them. I'm making a finding that there's sufficient indicia of authenticity to allow them to be admitted into evidence.

See U.S. app. at 65-66.

14

Sea, not to the Khian Sea, and the fact that certain radiotelegrams are communications between the Khian Sea and parties not associated with Reilly, including the Consul of the Republic of Honduras and the United States Coast Guard. Thus, we review the evidence of authenticity in this light.

Fed. R. Evid. 901(a) states that "[t]he requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." "Rule 901(a) treats preliminary questions of authentication and identification as matters of conditional relevance according to the standards of Rule 104(b). The condition of fact which must be fulfilled by every offer of real proof is whether the evidence is what its proponent claims." 5 Jack B. Weinstein & Margaret A. Berger, Weinstein's Evidence ¶901(a)[01] at 901–15 (1993).

Fed. R. Evid. 901(b) provides examples of appropriate methods of authentication. These examples include "[t]estimony that a matter is what it is claimed to be," Rule 901(b)(1), and "[a]ppearance, contents, substance, internal patterns, or other distinctive characteristics, taken in conjunction with circumstances," Rule 901(b)(4). Thus, "[i]t is clear that the connection between a message (either oral or written) and its source may be established by circumstantial evidence." United States v. Addonizio, 451 F.2d 49, 71 (3d Cir. 1971), cert. denied, 405 U.S. 936, 92 S.Ct. 949 (1972). Moreover, "[a]ny combination of items of evidence illustrated by Rule 901(b) . . .

15

will suffice so long as Rule 901(a) is satisfied."  5 Weinstein's Evidence ¶ 901(b)(1)[01] at 901-32.  Finally, "[t]he burden of proof for authentication is slight."  Link v. Mercedes-Benz of North America, Inc., 788 F.2d 918, 927 (3d Cir. 1986) (quoting McQueeney v. Wilmington Trust Co., 779 F.2d 916, 928 (3d Cir. 1985)).  We have explained that

> 'the showing of authenticity is not on a par with more technical evidentiary rules, such as hearsay exceptions, governing admissibility.  Rather, there need be only a prima facie showing, to the court, of authenticity, not a full argument on admissibility.  Once a prima facie case is made, the evidence goes to the jury and it is the jury who will ultimately determine the authenticity of the evidence, not the court.  The only requirement is that there has been substantial evidence from which they could infer that the document was authentic.'

McGlory, 968 F.2d at 328-29 (quoting Link, 788 F.2d at 928 (quoting United States v. Goichman, 547 F.2d 778, 784 (3d Cir. 1976))) (emphasis omitted); see also Michael H. Graham, Federal Practice and Procedure: Evidence § 6821 at 849 (Interim Edition 1992) ("Satisfaction of the requirement of authentication or identification is a matter to be approached in accordance with Rule 104(b).  Accordingly once the court finds that evidence has been introduced sufficient to permit a reasonable juror to find that the matter in question is what its proponent claims, a sufficient foundation for introduction in evidence has been laid, Rule 104(b).") (citations omitted).

There are several witnesses whose testimony supports the authenticity of the 35 radiotelegrams.  One of these witnesses is Humberto Carcamo Arias (Carcamo), the Khian Sea's

16

radio operator. He identified the radiotelegrams based on their appearance and content. See U.S. app. at 101-17. Carcamo testified that he transmitted the radiotelegrams sent from the Khian Sea and transcribed the radiotelegrams received by the Khian Sea. Moreover, he described the procedures that he used when sending and receiving the radiotelegrams. According to Carcamo, he would receive a handwritten message from Fuentes and then type the message on a SAIT Electronics radiotelegram form "to send it to Sait, S-a-i-t, Electronics. The original copy for them, one copy for us, and one copy for the head office." Id. at 102. Carcamo received incoming radiotelegrams from coastal stations that transmitted the messages to the ship in Morse code. Upon receiving these messages, Carcamo decoded them, transcribed them, and delivered them to Fuentes. Id. at 103-04. Finally, Carcamo stated that he placed his initials "HCA" on the records of all the outgoing and incoming radiotelegrams he prepared. Id. at 102-03. Each of the 35 radiotelegrams admitted into evidence bears his initials, corroborating his testimony.

Fuentes's testimony also supports the authenticity of the radiotelegrams. Fuentes testified that he sent or received each of the 35 radiotelegrams admitted into evidence and corroborated Carcamo's testimony regarding Carcamo's role in the transmission and receipt of the radiotelegrams. See R. app. at 653-55, 668-69. Fuentes's testimony also indicates that the 12 radiotelegrams admitted into evidence that originated in Annapolis were from Reilly and that the three radiotelegrams admitted into evidence that the Khian Sea sent to Annapolis were

17

sent to Reilly. Fuentes testified that he was hired by Reilly, that he took his directions from Reilly, id. at 649-51, and that while he was at sea, Reilly was the "only person" he knew in Annapolis and was his primary contact at Coastal Carriers and Amalgamated Shipping, id. at 654, 659, 680. Other testimony links these radiotelegrams with Reilly. Clare Dobbins, a secretary at Reilly's office in Annapolis, testified that she witnessed Reilly receive radiotelegrams from the Khian Sea, and sometimes delivered them to him from the telex machine. See U.S. app. at 23-24, 28. Finally, Reilly admitted that he was in contact with Fuentes, and that he communicated with him by phone and by cable on behalf of Coastal Carriers and Amalgamated. Id. at 159, 182, 196.

In addition to the testimony authenticating the radiotelegrams, there are multiple pieces of circumstantial evidence that support the conclusion that the radiotelegrams are what the government claims they are, namely radiotelegrams to and from the Khian Sea, many of which were sent or received by Reilly. First, Fuentes, the captain of the Khian Sea during the time period at issue, provided the radiotelegrams to the government in January 1992, when he came to the United States to testify before the grand jury regarding the activities of the Khian Sea. See R. app. at 739. Fuentes testified that although he received instructions from the "company" to destroy documents that might prompt an investigation into the whereabouts of the ash, see id. at 754, he took all of the radiotelegrams with him when he left the Khian Sea, and then provided them to the

18

government in January 1992, id. at 665, 739.[0]  Although this evidence is not "dispositive" on the question of the radiotelegrams' authenticity, it "is surely probative."  See McQueeney, 779 F.2d at 929 ("the fact that the copies were produced by the plaintiff in answer to an explicit discovery request for his Sea Service Records, while not dispositive on the issue of authentication, is surely probative.").

Second, the appearance of the radiotelegrams also supports the conclusion that they are authentic.  They are typed on forms bearing the letterhead "SAIT ELECTRONICS" and the label "RADIOTELEGRAM."  Moreover, as we noted above, each of the 35 radiotelegrams admitted into evidence bears Carcamo's initials, "HCA", in either the location designated for the name of the party sending the radiotelegram or the location designated for the party receiving the radiotelegram.  "The specificity, regularity, and official appearance of the documents increase the likelihood of their being authentic."  Id. (citations omitted).

Third, "the contents of the . . . [radiotelegrams] tend to support their claim to authenticity," id., by linking many of them to Reilly.  Of the 18 radiotelegrams in evidence that were sent by the Khian Sea, three were sent to Annapolis, and of the 17 radiotelegrams in evidence received by the Khian Sea, 12 originated in Annapolis.  See R. app. at 1186-1232.  Annapolis, of course, was the site of the Coastal Carriers office where Reilly worked.  Moreover, the three radiotelegrams in evidence

_____

[0]Carcamo also testified that Fuentes took the radiotelegrams with him when he left the Khian Sea.  See U.S. app. at 117.

19

sent to Annapolis from the Khian Sea were sent to Reilly's telex number at Coastal Carriers. Id. at 1200, 1209, 1232.[0]

Of the 12 radiotelegrams in evidence that were received by the Khian Sea and originated in Annapolis, three were signed "COALCOAST," see id. at 1215, 1216, 1220, one was unsigned, id. at 1218, five were signed "AMALGAMATED ANNAPOLIS," or "AMALGAMATED," id. at 1189, 1192, 1193, 1199, 1207, and three were signed "MASCO," id. at 1203, 1205, 1206. Reilly testified that "COALCOAST" was the "callback" for Coastal Carriers, the company at which he was vice president. See U.S. app. at 194. Moreover, Coastal Carriers represented Amalgamated, and one of the radiotelegrams signed "AMALGAMATED" contained a message instructing Fuentes to call "301 544 2909," Reilly's home phone number, see R. app. at 1192.[0] Before the Khian Sea received any radiotelegrams signed "MASCO," it received a radiotelegram signed "AMALGAMATED SHIPPING CORPORATION" and stating "PLEASE REPLY AMALGAMATED CARE OF MASCO FREEPORT BAHAMAS," id. at 1201. Furthermore, a radiotelegram signed "MASCO" and dated June 18, 1988, stated "DO NOT CALL DAYTIME." Id. at 1205. The primary numbers that Fuentes called for business purposes were Reilly's. Finally, the unsigned radiotelegram sent from Annapolis included the following message "COMFROM [sic] ROMO COASTAL CARRIERS CORPORATION ANNAPOLIS MARYLAND RCA 205654 OR T/X 7108678557" containing the Coastal Carriers telex number. Id. at 1218.

_____

[0]It is undisputed that the telex number for Coastal Carriers was 7108678557. See R. app. at 1218.
[0]It is undisputed that Reilly's home phone number was 301-544-2909. See U.S. app. at 17.

The Khian Sea's logs of outgoing radiotelegrams and phone calls also support the conclusion that Reilly sent the radiotelegrams originating in Annapolis, because they are consistent with Fuentes's testimony that he was reporting to Reilly and taking directions from him via telephone and telex. In considering the logs it is, of course, important to recognize that there are far more radiotelegrams listed than were admitted into evidence. The log covering December 1987 through February 1988 indicates that ten radiotelegrams were sent from the Khian Sea to the telex in Reilly's office at Coastal Carriers in Annapolis. Id. at 1186-88.[0] The log covering May 1988 through July 1988 indicates that the Khian Sea sent four radiotelegrams to Annapolis, id. at 1195, and that Fuentes made five phone calls to Reilly's home phone number and four phone calls to Reilly's office number, id. at 1196-97.[0] The log covering September 1988 through October 1988 identifies three phone calls from the Khian Sea to Reilly's home, and three to Reilly's office. Id. at 1210-11. Finally, the log covering November 1988 through December 1988 indicates that the Khian Sea sent two radiotelegrams to Reilly's office and that two phone calls were made to Reilly's home number and two to his office number. Id. at 1222-24.

Finally, as the government argues, the messages in the radiotelegrams and their relationship to each other, to Fuentes's

_____

[0]As we noted above, it is undisputed that the telex number for Coastal Carriers was 7108678557. See R. app. at 1218.
[0]As we noted above, it is undisputed that Reilly's home phone number was 301-544-2909. It is also undisputed that the office phone numbers for Coastal Carriers were 301-268-9797, 301-268-9798, and 301-268-9799. See U.S. app. at 17, 19-20, 137-138.

21

testimony, and to other evidence indicate that Reilly sent the radiotelegrams originating in Annapolis and support the district court's conclusion that <u>all</u> of the radiotelegrams in evidence satisfied the authenticity requirement. <u>See</u> U.S. br. at 24-31. A letter or telegram "may be authenticated by its contents with or without the aid of physical characteristics if the letter is shown to contain information that persons other than the purported sender are not likely to possess." Graham, Federal Practice and Procedure: Evidence § 6825 at 865-68; <u>see also</u> <u>United States v. Console</u>, 13 F.3d 641, 661 (3d Cir. 1993) ("'a document or telephone conversation may be shown to have emanated from a particular person by virtue of its disclosing knowledge of facts known peculiarly to him.'") (quoting Fed. R. Evid. 901 advisory committee note ex. (4)), <u>cert. denied</u>, 114 S.Ct. 1660 (1994); 5 Weinstein's Evidence ¶ 901(b)(4)[01] at 901-60 ("A letter, for example, can be shown to have emanated from a particular person or business by the fact that it would be unlikely for anyone other than the purported writer to be familiar with its subject matter and content."). "Although we do not know precisely how many people had the information contained in the proffered evidence, we suspect, as noted above, that the number is small. Therefore, the nature of the information in the documents further supports their authenticity." <u>McQueeney v. Wilmington Trust Co.</u>, 779 F.2d at 930. Moreover, "[w]here letters [or telegrams] fit into a course of correspondence or a progressive course of action, proof of the letters' relationship

22

to these events can authenticate any of the letters [or telegrams]." 5 Weinstein's Evidence ¶ 901(b)(4)[04] at 901-75.

The messages contained in the radiotelegrams, and the way in which they relate to each other, to Fuentes's conversations with Reilly, and to the activities of the Khian Sea link Reilly to the 12 radiotelegrams from Annapolis and one which Berbillis sent to the Khian Sea from Greece. A persuasive example of this circumstantial evidence is "the series of radiotelegrams introduced as Govt. Exhibit 69, and . . . [their relationship] to the testimony of Captain Fuentes and other documents." U.S. br. at 24. According to Fuentes, Reilly told him to take directions from Kimon Berbillis once the Khian Sea left Yugoslavia, that Abdel Hakim, a vice president of Romo Shipping, also might send him messages, see R. app. at 714, 723, and that "ballast" was to be the code word for the incinerator ash on board the Khian Sea, id. at 719-21. Thus, the record supports the conclusion that Berbillis and Hakim were acting on behalf of Reilly or at his behest. Id. at 714-17, 723-24. Government Exhibit 69A is a radiotelegram that Fuentes sent to Berbillis on September 29, 1988, stating that the ship had departed Suez, and that "NO RADIO CONTACT WAS POSSIBLE WITH HAKIM," and asking Berbillis to "PLEASE SEND INSTRUCT [sic] HOW MUCH BALLAST SHOULD I ARRIVE WITH." Id. at 1212. Fuentes testified that Government Exhibit 69B is the second radiotelegram he sent to Berbillis. In this radiotelegram, Fuentes asks for instructions on what to do when he arrives in Colombo, Sri Lanka, and states that he had "NO SUCCESS ON PHONE TO USA." Id. at

23

1213. According to Fuentes, the person he was trying to reach in the "USA" was Reilly. Id. at 717.

Moreover, Government Exhibit 69C is Berbillis's reply to Fuentes's request for instructions, and it states, "PLEASE DELAY YOU ETA UNTIL NOON OCTOBER 14 STOP TRY ARRIVE WITH 500 TONS IN ONEHOLD STOP REILLY WILL CABLE YOU INFO YOU REQUESTED." Id. at 1214 (emphasis added).

> A common aspect of authentication permissible under Rule 901(b)(4) is the reply doctrine which provides that once a letter, telegram, or telephone call is shown to have been mailed, sent or made, a letter, telegram or telephone call shown by its contents to be in reply is authenticated without more.

Graham, Federal Practice and Procedure: Evidence § 6825 at 868–69; 5 Weinstein's Evidence ¶ 901(b)(4)[05] at 901–76 ("A letter can be authenticated by testimony or other proof that it was sent in reply to a duly authenticated writing. A reply letter often needs no further authentication because it would be unlikely for anyone other than the purported writer to know and respond to the contents of an earlier letter addressed to him."). Accordingly, inasmuch as Fuentes's testimony authenticates Government Exhibit 69B, and 69C is a reply to 69B, 69C satisfies the authenticity requirement. Of course, the contents of Government Exhibit 69C also link the radiotelegram to Reilly, whose name is mentioned explicitly in the radiotelegram.

Government Exhibit 69C helps authenticate Government Exhibit 69D. According to Government Exhibit 69C, Reilly was going to send Fuentes a radiotelegram containing instructions regarding his arrival in Sri Lanka and how much "ballast" Fuentes

24

should arrive with. One day after receiving this radiotelegram, Fuentes received Government Exhibit 69D, a radiotelegram from Annapolis that was signed "COALCOAST" and stated "SUGGEST ARRIVE COLOMBO PM 14TH WITH ONLY 500 TONS BALLAST ADVISING AGENTS OTHERS DETAILS LATER CONFIRM ROMO." R. app. at 1215. The log of the ship's outgoing calls and radiotelegrams indicates that Fuentes called Reilly's home phone number on October 9, the following day, id. at 1210, and Fuentes testified that both the radiotelegram and Reilly's statements on the phone were instructions to dump all but 500 tons of the remaining ash, id. at 719-20. The radiotelegram admitted as Government Exhibit 69D and its relationship (1) to Berbillis's earlier radiotelegram, (2) to the record of Fuentes's call to Reilly and (3) to Fuentes's testimony, authenticate Government Exhibit 69D and indicate that it came from Reilly. It is unlikely that someone other than Reilly would use the alleged code word "ballast," and send Fuentes instructions regarding his arrival in Colombo and how many tons of ballast to arrive with, especially in light of Berbillis's earlier radiotelegram. See 5 Weinstein's Evidence ¶901(b)(4)[01] at 901-66 ("The use of code words or other names or nuances of speech particularly known or used by the purported writer can authenticate a writing.").

Fuentes received a second radiotelegram on October 9 that also was signed "COALCOAST" and instructed him to go to Singapore instead of to Sri Lanka. See R. app. at 1216. The circumstances indicate that Reilly also sent this radiotelegram, Government Exhibit 69E. After receiving this radiotelegram,

25

Fuentes sent a radiotelegram (Government Exhibit 69F) to Berbillis, informing him that the ship was going to Singapore. Id. at 1217. Subsequently, on October 15, Fuentes received an unsigned radiotelegram (Government Exhibit 69G) sent from Annapolis that stated, "DISPOSE 500 BALLAST PRIOR ARRIVAL SINGAPORE . . . CONFORM [sic] ROMO, COASTAL CARRIERS CORPORATION ANNAPOLIS MARYLAND RCA 205654 OR T/X 7108679557." Id. at 1218. Fuentes testified that he interpreted the message as an instruction to dump the remaining 500 tons of ash. Id. at 725. Fuentes's testimony, the reference to the "500 BALLAST" which appeared earlier in Government Exhibit 69D, the references to Coastal Carriers and its telex number in Annapolis, and the context of the radiotelegram more than suffice to authenticate this radiotelegram and to support the inference that Reilly sent it. Again, it is unlikely that someone other than Reilly would use the alleged code word "ballast," be aware of the facts that the ship had only 500 tons of ash remaining in its holds and that it was scheduled to arrive in Singapore, and send Fuentes instructions to dispose of the remaining ash.

On the day that Fuentes received this radiotelegram, Fuentes sent another radiotelegram to Berbillis (Government Exhibit 69H) informing him that the ship's arrival in Singapore would be delayed until November 5, due to "TROUBLES WITH DOZZER AND GENERATORS ETC ETC PLUS FINAL CLEANING HARDER THAN EXPECTED." Id. at 1219. Fuentes testified that on the following day, he spoke with Reilly about the ash dumping process, id. at 726, and the log of the ship's outgoing calls and radiotelegrams confirms

26

that he called Reilly's home phone number that day, id. at 1210. Finally, on October 19, a letter bearing the typed signature of Reilly was faxed from Coastal Carriers to the American Bureau of Shipping, informing it that the Khian Sea would arrive in Singapore "for completion of class work commenced in Bijela, Yugoslavia." See U.S. app. at 261. Reilly knew that the "class work" could not be completed until the ship's holds were empty.[0] Thus, the source, typed signature, and message indicate that Reilly sent this letter, and support our conclusion that Reilly sent the radiotelegrams originating in Annapolis, and that, having authorized Berbillis to communicate with Fuentes on his behalf, Reilly was informed of the contents of their correspondence.

Reilly argues that four of the radiotelegrams allegedly sent from the Khian Sea to Athens, Greece, during the period when the crew allegedly was dumping ash into the Indian Ocean were not properly authenticated because, although they bore Carcamo's initials, "Carcamo himself testified that he 'didn't transmit any message' during that period because of 'captain's order' not to do so." See R. br. at 40 n.8 (quoting R. app. at 885-86). However, Fuentes testified that he only instructed Carcamo not to communicate with passing ships during the dumping operation, and that the Khian Sea remained in contact with Annapolis. See R.

---

[0]On August 17, 1988, the American Bureau of Shipping sent a letter to Reilly informing him that its surveyor could not conduct the examination required for reclassification of the Khian Sea because "the vessel remains about half loaded with cargo," see U.S. app. at 259.

27

app. at 837-38. It is well-established that "upon consideration of the evidence as a whole, if a sufficient foundation has been laid in support of introduction, contradictory evidence goes to the weight to be assigned by the trier of fact and not to admissibility." Graham, Federal Practice and Procedure: Evidence § 6821 at 850 (citation omitted); 5 Weinstein's Evidence ¶901(a)[01] at 901-17 ("The issue of credibility and probative force is for the jury.").

Thus, we conclude that the evidence was more than adequate to authenticate the 35 radiotelegrams admitted into evidence. Moreover, even if the four incoming radiotelegrams that the evidence does not link to Reilly were not authenticated properly, see R. app. at 1201 (68D), 1202 (68E), 1226 (70A), 1228 (70C), their admission into evidence was harmless.[0] "Trial error is harmless if it is highly probable that the error did not affect the judgment." United States v. Copple, 24 F.3d 535, 546 (3d Cir. 1994) (citing United States v. Simon, 995 F.2d 1236, 1244 (3d Cir. 1993)). See also Lippay v. Christos, 996 F.2d 1490, 1500 (3d Cir. 1993). We have held that "[h]igh probability exists if the court has a 'sure conviction that the error did not prejudice the defendant.'" Copple, 24 F.3d at 546 (quoting Simon, 955 F.2d at 1244). As the government argues, "[t]he jury could reasonably find that the radiotelegrams introduced as GE 69D and 69G (R. app. 1215, 1218) were orders from Reilly to dump ash into the ocean." See U.S. br. at 27. Consequently, we are

---

[0]These radiotelegrams should not be confused with the four radiotelegrams the Khian Sea sent to Athens.

28

convinced that the district court's admission of the four incoming radiotelegrams not linked to Reilly did not prejudice him, as these radiotelegrams only provided additional context for the truly incriminating radiotelegrams which the evidence did link to Reilly.

B. Did the radiotelegrams constitute inadmissible hearsay?

Fed. R. Evid. 801 defines hearsay as a "statement other than one made by a declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted."  Hearsay is generally inadmissible because
> 'the statement is inherently untrustworthy: the declarant may not have been under oath at the time of the statement, his or her credibility cannot be evaluated at trial, and he or she cannot be cross-examined.'

United States v. Console, 13 F.3d at 656 (quoting United States v. Pelullo, 964 F.2d 193, 203 (3d Cir. 1992)).  "We exercise plenary review over the district court's interpretation of the Federal Rules of Evidence but review a ruling based on a permissible interpretation of a rule for abuse of discretion." Console, 13 F.3d at 656 (citations omitted).

We accept Reilly's contention that the incoming radiotelegrams to the Khian Sea were the product of three out-of-court "statements": (1) the sender's statement to a coastal station operator, (2) the coastal station's transmission of the message in Morse code to the Khian Sea, and (3) Carcamo's documenting of the message.  See R. br. at 44.  Rule 805 provides that, "[h]earsay included within hearsay is not excluded under

29

the hearsay rule if each part of the combined statements conforms with an exception to the hearsay rule." See Fed. R. Evid. 805. However, Reilly argues that each of these "statements" constitutes inadmissible hearsay and that therefore the district court abused its discretion by admitting the incoming radiotelegrams into evidence. See R. br. at 43-48. We disagree.

Our review indicates that each of the three "statements" reflected in 13 of the 17 incoming radiotelegrams in evidence, the 12 from Reilly and the one from Berbillis in Greece, was admissible. The initial statement reflected in the incoming radiotelegrams, the statement by the sender to a coastal station operator, consists of several components: (1) the message; (2) the radiotelegram's point of origin and its destination; and (3) the date on which the radiotelegram was handed in to the coastal station operator. None of the messages contained in the incoming radiotelegrams constitute hearsay because they consist largely of instructions to Fuentes. See R. app. at 1189 (Govt. Exh. 67A), 1192 (Govt. Exh. 67D), 1193 (Govt. Exh. 67E), 1199 (Govt. Exh. 68B), 1201 (Govt. Exh. 68D), 1202 (Govt. Exh. 68E), 1203 (Govt. Exh. 68F), 1205 (Govt. Exh. 68H), 1206 (Govt. Exh. 68I), 1207 (Govt. Exh. 68J), 1214 (Govt. Exh. 69C), 1215 (Govt. Exh. 69D), 1216 (Govt. Exh. 69E), 1218 (Govt. Exh. 69G), 1220 (Govt. Exh. 69I), 1226 (Govt. Exh. 70A), 1228 (Govt. Exh. 70C). "Instructions to an individual to do something are . . . not hearsay," Graham, Federal Practice and Procedure: Evidence § 6705 at 409, because they are not declarations of fact and therefore are not capable of being true or false, Crawford

30

v. Garnier, 719 F.2d 1317, 1323 (7th Cir. 1983), United States v. Gibson, 675 F.2d 825, 833–34 (6th Cir.), cert. denied, 459 U.S. 972, 103 S.Ct. 305 (1982), United States v. Keane, 522 F.2d 534, 558 (7th Cir. 1975), cert. denied, 424 U.S. 976, 96 S.Ct. 1481 (1976).

As the government argues, the messages "were not offered to prove the truth of the statements contained within them, but instead to prove the fact that the certain instructions had been given,"  see U.S. br. at 32; Anderson v. United States, 417 U.S. 211, 220 n.8, 94 S.Ct. 2253, 2260 n.8 (1974), and as circumstantial evidence of Reilly's state of mind, namely his knowledge of the ash dumping operation, 4 Weinstein's Evidence ¶801(c)[01] at 801–103 ("[a] statement offered to show the state of mind of the declarant is analytically not hearsay if the declarant does not directly assert the state of mind that is in issue.").  Although one of the incoming messages included Reilly's phone number, see R. app. at 1192, another included his name, id. at 1214, and a third included the telex number at Coastal Carriers, id. at 1218, even these three messages do not constitute hearsay, because they were offered only as circumstantial evidence that Reilly sent the radiotelegrams originating in Annapolis.  See McGlory, 968 F.2d at 333 (documents did not constitute hearsay by virtue of the fact that they contained the defendant's name and the names and phone numbers of other individuals, as they were "offered merely as circumstantial evidence of . . . [defendant's] association" with the other individuals).  Thus, the first component of the

31

statements by the sender to a coastal station operator, which we refer to as the "messages," did not constitute hearsay. Similarly, the typed signatures on the 12 radiotelegrams originating in Annapolis did not constitute hearsay as they were offered only as circumstantial evidence that the radiotelegrams were sent by Reilly.[0]

However, the other components of the statements by the sender to the coastal station operator, namely the point of origin and destination of each radiotelegram, and the date on which each radiotelegram was sent, were introduced to prove their truth, i.e., to prove that the radiotelegrams were sent from the point of origin to the destination on the designated date. We consider this information to be statements made by the sender and then relayed by the coastal station operator because the sender's verbal and nonverbal conduct in filing a radiotelegram at a particular coastal station on a particular date for transmission to a designated location intentionally communicated each of these facts to the coastal station operator for transmission. In effect, the sender told the operator these facts so the operator could tell them to the Khian Sea.[0]

_____

[0]If the typed signatures actually read "Reilly," then they would have been offered for the truth of the matter asserted. However, as we discuss below, such radiotelegrams would have been admissible, nonetheless, as admissions. See Fed. R. Evid. 801(d)(2)(A). The typed signature "Kimon," see R. app. at 1214, on the radiotelegram that the government claims is from Kimon Berbillis, is admissible on this basis. See Fed. R. Evid. 801(d)(2)(C).

[0]If the government had called a coastal station operator as a witness, and the operator had testified regarding the receipt and transmission of the messages and laid the foundation for the introduction of his or her "statements" pursuant to the business

32

In the 12 radiotelegrams originating in Annapolis, these "statements" regarding the point of origin and destination of the radiotelegram, and the date on which the radiotelegram was sent were admissible pursuant to Federal Rule of Evidence 801(d)(2)(A). Rule 801(d)(2)(A) provides that statements made by a party to an action and offered into evidence by an opposing party do not constitute hearsay. As we discussed above, there is substantial evidence indicating that Reilly sent the 12 radiotelegrams originating in Annapolis.[0] Annapolis was the site of the Coastal Carriers office where Reilly worked, and the contents of these 12 radiotelegrams, combined with other circumstantial evidence and Fuentes's testimony indicate that they were sent by Reilly.

In addition to the circumstantial evidence we have already discussed, the relationship between Reilly's three sets of meetings with Fuentes and certain radiotelegrams that Fuentes

records exception to the hearsay rule, we would not need to take such a complex layered approach to these components of the radiotelegrams. But inasmuch as the operator or operators did not testify and the radiotelegrams were not introduced as business records of the coastal sending station, our complex layered approach to the hearsay analysis is necessary.

[0]The dissent maintains that we "effectively and impermissibly equate[] our evidentiary rules governing admissibility with the slight showing required for authentication." See dissent typescript at 5. It is true that we rely on the evidence linking Reilly to the 12 radiotelegrams originating in Annapolis and the radiotelegram from Berbillis both as evidence of the radiotelegrams's authenticity and as evidence that the statements contained in the radiotelegrams do not constitute hearsay. We do so, however, not because we equate the showings for authenticity and admissibility, but because the substantial quantity of evidence linking Reilly to these radiotelegrams satisfies not only the "slight" showing required for authenticity, but also the greater showing required for admissibility.

33

received subsequent to these meetings indicates that the radiotelegrams originating in Annapolis were sent by Reilly.[0] First, Reilly met with Fuentes in Ft. Pierce, Florida, and according to Fuentes, promised the ship's officers and crew members additional compensation to begin dumping the ash while en route to West Africa.  Subsequent to this meeting, Fuentes received three radiotelegrams from Annapolis, the first instructing him to "SUSPEND OPERATIONS" and return to Philadelphia, see R. app. at 1189, the second instructing him to call "301 544 2909," id. at 1192, Reilly's home phone number, and

---

[0]The dissent contends that our "hearsay analysis is fundamentally flawed because it is premised on the assumption that the 12 radiotelegrams allegedly sent by Reilly originated in Annapolis, where Reilly lived and worked.  . . .  Yet, the Government never adduced any evidence, apart from the disputed documents themselves, that the messages contained in the radiotelegrams had actually originated in Annapolis."  See dissent typescript at 7. First of all, our hearsay analysis is not premised solely on the evidence that 12 of the radiotelegrams originated in Annapolis. Evidence that these radiotelegrams originated in Annapolis was only one of many pieces of evidence linking these 12 radiotelegrams to Reilly.  Other pieces of evidence included Fuentes's testimony, see maj. typescript at 17, the messages and typed signatures contained in the radiotelegrams, id. at 19-20, the Khian Sea's logs of outgoing radiotelegrams and phone calls which corroborate Fuentes's testimony that he was taking directions from Reilly, id. at 20-21, Reilly's admission that he communicated with the Khian Sea by radiotelegram, id. at 17, Clare Dobbins's testimony that she witnessed Reilly receive radiotelegrams from the Khian Sea, id., and the relationship between the messages in the radiotelegrams, Fuentes's testimony, the activities of the Khian Sea, and the timing of Reilly's three sets of meetings with Fuentes, id. at 21-27, 34-36.  Second of all, the "documents themselves" are not the only evidence indicating that the radiotelegrams originated in Annapolis.  The relationship between the outgoing radiotelegrams and calls to Annapolis, and the 12 radiotelegrams indicating that they were "handed in at Annapolis" also indicates that these radiotelegrams were, in fact, sent from Annapolis.

the third containing instructions regarding the ship's arrival in Philadelphia, id. at 1193.

Once the ship returned to Philadelphia, Reilly met with Fuentes again, and according to Fuentes, they discussed the execution of the dumping plan they had developed. Subsequent to this meeting, after the ship had left Philadelphia, Fuentes received a radiotelegram from Annapolis instructing him to proceed toward Cape Verde, away from the United States until the "MISSION" was accomplished, id. at 1199, along with other radiotelegrams containing instructions on how to proceed, id. at 1203, 1205, 1206, 1207. According to Fuentes, the crew began dumping the ash into the Atlantic Ocean and continued to do so until problems developed with the machinery they were using, at which point, Fuentes sent a radiotelegram to Reilly stating that 3500 tons of "CARGO" remained on board, and that the equipment needed to off-load the ash had broken. Id. at 1209.

Finally, the third place in which Reilly and Fuentes met was Bijela, Yugoslavia. Fuentes testified that at this meeting, Reilly told him that: (1) Kimon Berbillis would give him instructions regarding the remainder of the trip; (2) if no country agreed to accept the remaining ash, it would be dumped in the ocean; and (3) they would refer to the ash as "ballast." See D. app. at 299, 304-05. Following this meeting, Fuentes received a radiotelegram sent from Greece by Berbillis instructing him to arrive in Sri Lanka with only 500 tons of ballast (the 13th incoming radiotelegram with admissible statements), see R. app. at 1214, a radiotelegram originating in Annapolis confirming

these instructions, id. at 1215, another radiotelegram from Annapolis instructing him to proceed to Singapore instead of Sri Lanka, id. at 1216, a third radiotelegram from Annapolis instructing him to dispose of the remaining 500 tons of "BALLAST" before arriving in Singapore, id. at 1218, and a fourth radiotelegram with instructions regarding the ship's arrival in Singapore, id. at 1220.  Thus, the relationship between Fuentes's testimony regarding the substance of his meetings with Reilly and the content of the messages that Fuentes received following his meetings with Reilly confirms that the messages originating in Annapolis were from Reilly.

The radiotelegram originating in Greece bore the typed signature "KIMON," Berbillis's first name.  Id. at 1214. Fuentes's testimony regarding his contact with Berbillis confirms that the radiotelegram was from Berbillis, and indicates that Reilly had authorized Berbillis to make the "statements" contained in the radiotelegram to Fuentes.  In fact, according to Fuentes, Reilly introduced him to Berbillis and specifically told him to take instructions from Berbillis once the ship left Yugoslavia.  Id. at 714-17, 723-24.[0]

"Rule 801(d)(2)(C) specifically excludes from the definition of hearsay any statements used against a party which were made by another person authorized by the party to make a

---

[0]The dissent states that "there is no . . . proof to establish that Berbillis . . . 'was acting on behalf of Reilly or at his behest.'"  See dissent typescript at 13.  However, we find Fuentes's testimony sufficient to establish the relationship between Reilly and Berbillis.

statement concerning the subject." Lightning Lube, Inc. v. Witco Corp., 4 F.3d 1153, 1198 (3d Cir. 1993). In light of the evidence indicating that Reilly authorized Berbillis to send instructions to Fuentes on his behalf, the statements made by Berbillis to a coastal station operator, see R. app. at 1214, are admissible pursuant to Rule 801(d)(2)(C). See Graham, Federal Practice and Procedure: Evidence §6722 at 503-04 ("Authorization to make a statement concerning the subject matter may . . . be established by the acts or conduct of the principal or his statements to the agent or third party."); see also Michaels v. Michaels, 767 F.2d 1185, 1201 (7th Cir. 1985) (held that telexes sent by a third party to potential buyers of defendant's company were admissible under Rule 801(d)(2)(C) because "[v]iewing the other evidence in the light most favorable to the plaintiff, . . . . [the defendant] authorized . . . [the third party] to act as the Company's broker and contact . . . potential buyers."), cert. denied, 474 U.S. 1057, 106 S.Ct. 797 (1986). Thus, in 13 of the 17 incoming radiotelegrams in evidence, all components of the statements by the sender to the coastal station operator, namely the messages, the "statements" regarding the point of origin and destination of each radiotelegram, and the "statements" regarding the date on which each radiotelegram was sent, were admissible.

The second set of "statements" reflected in the incoming radiotelegrams consists of the statements made by the coastal operators to the Khian Sea. In the 12 radiotelegrams in evidence sent by Reilly and the radiotelegram in evidence sent by Berbillis, the statements by the coastal operators to the Khian

37

Sea also were admissible pursuant to Rule 801(d)(2)(C) because they were "statement[s] by a person [the coastal operators] authorized by . . . [Reilly, either directly or indirectly through Berbillis] to make a statement concerning the subject" of the radiotelegram.  Fed. R. Evid. 801(d)(2)(C).

For the same reason, the third "statement" reflected in the 12 radiotelegrams sent by Reilly and the one from Berbillis, Carcamo's documenting of the radiotelegrams, does not constitute hearsay.  Id.[0]  Moreover, Carcamo's documenting of the incoming radiotelegrams also would be admissible under Rule 803(6), the exception for records of regularly conducted business. See U.S. br. at 33.  This exception authorizes the admission of:

> [a] memoranda, report, record, or data compilation, in any form, of acts, events, conditions, opinions, or diagnoses, made at or near the time by, or from information transmitted by, a person with knowledge, if kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the memoranda, report, record, or data compilation, all as shown by the testimony of the custodian or other qualified witness, unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness.

---

[0]The dissent contends that there is no proof that Reilly authorized coastal station operators to transmit the radiotelegrams or authorized Carcamo to decode and document the radiotelegrams.  See dissent typescript at 13-14.  In our opinion, Fuentes's testimony, Reilly's admission that he communicated with the Khian Sea by radiotelegram, Clare Dobbins's testimony that she witnessed Reilly receive radiotelegrams from the Khian Sea, and the plethora of other circumstantial evidence linking Reilly to the radiotelegrams more than suffice to establish that Reilly authorized the coastal station operators and Carcamo to play their respective roles in the transmission of the radiotelegrams.

Carcamo was a witness "qualified" to lay the foundation required by Rule 803(6) for the admission of the radiotelegrams because as the radio operator for the Khian Sea, he was responsible for creating and storing them, and had "the ability to attest to the foundational requirements of Rule 803(6)." Console, 13 F.3d at 657.

> The foundation requirements to which a qualified witness must attest are: '(1) [that] the declarant in the records had knowledge to make accurate statements; (2) that the declarant recorded statements contemporaneously with the actions which were the subject of the reports; (3) that the declarant made the record in the regular course of the business activity; and (4) that such records were regularly kept by the business.'

Id. at 657 (quoting United States v. Furst, 886 F.2d 558, 571 (3d Cir. 1989), cert. denied, 493 U.S. 1062, 110 S.Ct. 878 (1990)).

Carcamo testified to the four foundation requirements of the business records exception by testifying that: he was the radio operator for the Khian Sea during the relevant period of time, see R. app. at 863; that he was responsible for contacting the coastal stations to receive and transmit radiotelegrams for the ship and for keeping records of all communications to and from the ship, id. at 863-64; that the coastal stations transmitted messages to the ship in Morse code, id. at 866-67;

that he had years of experience as a radio operator and was trained in Morse code, id. at 867–68; and that he decoded the Morse code signals, and documented the messages as soon as he received them, id., and then delivered the written messages to Fuentes, id. at 867. Carcamo also kept a file of the incoming and outgoing messages. Id. at 863, 869. Carcamo's testimony "satisfied the foundation requirements of Rule 803(6) because it 'demonstrate[d] that the records . . . [of the radiotelegrams] were made contemporaneously with the act the documents purport[ed] to record by someone with knowledge of the subject matter, that they were made in the regular course of business, and that such records were regularly kept by the business.'" Console, 13 F.3d at 657 (quoting United States v. Pelullo, 964 F.2d at 201). Moreover, Fuentes's testimony corroborated Carcamo's testimony regarding his responsibilities for documenting and storing incoming and outgoing radiotelegrams, and the procedures employed for transmitting and receiving the radiotelegrams. See R. app. at 653–55, 668–69.

As we have noted, the 12 radiotelegrams originating in Annapolis incorporate messages provided originally by Reilly and the radiotelegram from Berbillis incorporates a message which Reilly authorized Berbillis to send. Moreover, all 13 of these radiotelegrams incorporate the Morse code transmissions by coastal station operators. Under Rule 803(6), any statement incorporated into a business record must be verified by the party recording the statement, made by a party under "a duty to report," or admissible pursuant to another exception to the

40

hearsay rule.  See Graham, Federal Practice and Procedure: Federal Rules of Evidence § 6757, at 641-43; Console, 13 F.3d at 657-58; Fed. R. Evid. 805.  As we have indicated, the statements by Reilly were admissible under Rule 801(d)(2)(A), and the statements by Berbillis and the coastal station operators were admissible under Rule 801(d)(2)(C).

Thus, the district court did not err in admitting the 12 incoming radiotelegrams sent by Reilly or the radiotelegram sent by Berbillis, as each of the three "statements" reflected in these radiotelegrams was not hearsay or was admissible under an exception to the hearsay rule.  Although the district court may have erred in admitting the other four incoming radiotelegrams into evidence, see R. App. at 1201, 1202, 1226, 1228, as we indicated above, such an error would be harmless.

Moreover, the district court also did not err by admitting the 18 outgoing radiotelegrams into evidence.  The outgoing radiotelegrams consist of two "statements": (1) Fuentes's statement to Carcamo, and (2) Carcamo's documenting of the statement.  Fuentes's statements were admissible pursuant to Rule 801(d)(1) which provides that a statement is not hearsay if

> [t]he declarant testifies . . . and is subject to cross-examination concerning the statement, and the statement is . . . (B) consistent with his testimony and is offered to rebut an express or implied charge against the declarant of recent fabrication or improper influence or motive.

As the government points out, the defendants suggested to the jury that Fuentes had ulterior motives for cooperating with the government and was fabricating testimony to protect himself.  See

U.S. app. at 82-90A. Thus, Fuentes's statements in the radiotelegrams were admissible to rebut these suggestions.

The second "statement" reflected in the outgoing radiotelegrams, Carcamo's documenting of Fuentes's statements, was admissible pursuant to Rule 803(6). As we discussed above, Carcamo testified to the four foundation requirements of Rule 803(6). Specifically with regard to the outgoing radiotelegrams, Carcamo testified that he typed copies of the handwritten messages Fuentes asked him to send, and then sent a copy to Sait Electronics and retained one for the ship's records. See R. app. at 866. Again, Fuentes's testimony corroborated Caracamo's. Id. at 653-55.

Thus, neither the 13 incoming radiotelegrams which the evidence links to Reilly nor the 18 outgoing radiotelegrams constituted inadmissible hearsay, and the admission of the four incoming radiotelegrams not linked to Reilly was harmless.

C. <u>Were the questions posed to Reilly too ambiguous to allow his response to form the basis of a false declarations conviction?</u>

At the contempt hearing held on December 15, 1988, in the Eastern District of Pennsylvania, Reilly was asked, under oath, whether he had "any knowledge . . . as to what happened to the incinerator residue" on board the <u>Khian Sea</u>, or "any knowledge as to the means by which it might be ascertained what happened to the residue." <u>See</u> U.S. app. at 275. Reilly responded "[n]o, sir" to both questions. <u>Id.</u>

42

In January 1990, Reilly voluntarily appeared before a federal grand jury for the District of Delaware that was investigating potential ocean dumping violations in connection with the activities of the Khian Sea between September 1986 and December 1988. Id. at 285-403. Reilly was informed that the grand jury was investigating the disposal of ash from the Khian Sea and was advised of his right to leave and seek legal counsel. See U.S. app. at 288. He then testified that he had not directed anyone to remove the ash from the ship, id. at 377-78, and that he had no knowledge of what happened to the ash, id. at 380-81.

On the basis of this testimony, Reilly was indicted in two counts for knowingly making false material declarations. 18 U.S.C. § 1623(a). Prior to trial, Reilly challenged the Delaware indictment alleging that the questions he was asked before the grand jury were too vague and ambiguous to support a conviction under section 1623(a). The district court rejected this argument. See United States v. Reilly, 811 F. Supp. at 180. However, Reilly now contends that both questions asked before the Delaware grand jury and questions posed at the contempt hearing held in the Eastern District of Pennsylvania were too vague and ambiguous to support his false declarations convictions. See R. br. at 49-56. We disagree.

First, Reilly claims that the following question posed before the grand jury was too vague and ambiguous: "What happened to the ash?". According to Reilly, "[t]here was nothing about the context within which 'What happened to the ash?' was asked that signified that the questioner did not care where, in any

43

specific sense, the ash was off-loaded, but instead was concerned only with whether it was disposed of somewhere -- anywhere -- in the ocean." Id. at 52. We reject Reilly's suggestion that because he thought he was being asked exactly "[w]here in the ocean" the ash was off-loaded he was not testifying falsely by stating that he did not know what happened to the ash. There is no doubt that the question "[w]hat happened to the ash?" was sufficiently precise to support Reilly's false declaration conviction. A person who knows that the ash was dumped in the ocean knows what happened to the ash. The grand jury, after all, did not ask him where it was dumped. Moreover, we reject Reilly's argument that the grand jury's question, "[d]id you direct anyone to take anything off that ship after it left Yugoslavia?", see U.S. app. at 377-78, was vague due to the use of the term "direct" and the placement of the modifier "after it left Yugoslavia."

We also find that the questions posed in the district court contempt proceeding regarding Reilly's "knowledge" were sufficiently precise. Reilly was asked: "[d]o you have any knowledge . . . as to what happened to the incinerator residue on board the vessel?" and "[d]o you have any knowledge as to the means by which it might be ascertained what happened to the residue on board the vessel?". See id. at 237. We do not believe that in the context of the questions, the term "'knowledge,' without further definition, is inherently ambiguous." See R. br. at 54 (citing United States v. Cook, 497 F.2d 753, 764 & n.4 (9th Cir. 1972) (dissenting opinion),

44

majority opinion withdrawn and dissenting opinion reinstated on rehearing as majority position in relevant part, 489 F.2d 286 (9th Cir. 1973)).

Reilly cites Bronston v. United States, 409 U.S. 352, 361-62, 93 S.Ct. 595, 601-02 (1973), in support of his argument that the questions underlying his false declaration convictions were excessively vague. However, Bronston is distinguishable because, as we noted in United States v. Slawik, 548 F.2d 75, 86 (3d Cir. 1977), "Bronston involved literally true but misleading answers." In Bronston, 409 U.S. at 361-62, 93 S.Ct. at 601-02, the Supreme Court held that the perjury statute, 18 U.S.C. §1621, does not apply to statements that are literally true, even if these statements create an implication which is false. The Supreme Court's reasoning in Bronston applies equally to the false declarations statute, section 1623. See Slawik, 548 F.2d at 83 (To violate 18 U.S.C. § 1623, testimony must be "both false and material. If literally true, there was no offense, even if . . . [the defendant's] answer was deliberately misleading.") (citing Bronston, 409 U.S. 352, 93 S.Ct. 595 (1973)). However, this case bears no resemblance to Bronston.

Bronston involved a perjury prosecution arising from a bankruptcy hearing at which one of the defendant's creditors asked him whether he had ever had a Swiss bank account, and the defendant responded by stating that his company once had a Swiss bank account for six months. Id. at 354, 93 S.Ct. at 598. Though the defendant's answer was unresponsive and created the false implication that he had never had a Swiss bank account, his

45

literal statement regarding his company's Swiss bank account was true.  Id.  Therefore, the Supreme Court concluded that he could not be convicted of perjury as Congress did not intend to criminalize "answers unresponsive on their face but untrue only by 'negative implication.'"  Id. at 361, 93 S.Ct. at 601.

We cannot classify Reilly's responses in the district
court or to the grand jury as "literally true."  Moreover, we
have "eschew[ed] a broad reading of Bronston," id., and held that
[a]s a general rule, the fact that there is some ambiguity in a
falsely answered question will not shield the respondent from a
perjury or false statements prosecution. . . . Normally, it is
for the petit jury to decide which construction the defendant
placed on the question. . . .  It is difficult to define the
point at which a question becomes so ambiguous that it is not
amenable to jury interpretation.  We have stated that the point
is reached 'when it [is] entirely unreasonable to expect that the
defendant understood the question posed to him.' Slawik, 548 F.2d
at 86.  Other courts have said that '[a] question is
fundamentally ambiguous when it "is not a phrase with a meaning
about which men of ordinary intellect could agree, nor one which
could be used with mutual understanding by a questioner and
answerer unless it were defined at the time it were sought and
offered as testimony."'

United States v. Ryan, 828 F.2d 1010, 1015 (3d Cir. 1987)

(quoting United States v. Lighte, 782 F.2d 367, 375 (2d Cir.

1986)) (some internal citations omitted).  Under either

construction of the Bronston standard for ambiguity, it is clear

that the questions posed to Reilly were not so ambiguous that

they were no longer amenable to jury interpretation.

> D. Did Reilly's false declarations
> indictment    adequately allege the falsity
> of Reilly's    responses to the grand jury
> and the        district court?

Reilly argues that the indictments on which his false

declaration convictions were based were defective because they

46

failed to allege adequately the falsity of his responses to the district court and the grand jury. See R. br. at 56-60. We have held that "a conviction under 18 U.S.C. § 1623 may not stand where the indictment fails to set forth the precise falsehood alleged and the factual basis of its falsity with sufficient clarity to permit a jury to determine its verity and to allow meaningful judicial review of the materiality of those falsehoods." Slawik, 548 F.2d at 83. It is undisputed that the Delaware indictment alleged that Reilly's responses to the grand jury were false because he knew the ash on board the Khian Sea had been dumped into the water in and around the Indian Ocean. See R. br. at 57-58. On this basis, the district court held that the Delaware indictment adequately alleged the falsity of Reilly's statements. Reilly, 811 F. Supp. at 179. The Pennsylvania indictment alleged that Reilly's responses to the district court were false because he knew the ash on board the Khian Sea had been dumped into the water in and around the Atlantic Ocean and Indian Ocean. We conclude that both the Delaware indictment and the Pennsylvania indictment adequately alleged the falsity of Reilly's statements. See R. br. at 57-58.

Reilly analogizes this case to United States v. Tonelli, 577 F.2d 194, 198 (3d Cir. 1978), in which we held that a false declarations indictment is defective when it "fails to specify in what particular the defendant's reply was false." However, Tonelli is distinguishable. In Tonelli, the indictment alleged that the defendant made a false declaration when he denied having participated in placing certain pension fund monies

47

in certificates of deposit.  <u>Tonelli</u>, 577 F.2d at 197.  Although the "defendant's initial denial of involvement, standing alone, was not true, . . . when the prosecutor subsequently defined 'participation in the placement of . . . monies . . . for the purchase' as including a recommendation [to use a particular bank, the defendant] . . . answered truthfully."  <u>Id</u>. at 198.  Thus, at least one of the defendant's responses to the question was "literally true."  Moreover, the indictment quoted only the first, more general question, "ignoring the qualifying definitions [subsequently] used by the prosecutor," and therefore it was "misleading."  <u>Id</u>.

By identifying Reilly's responses that he had no idea what happened to the ash or how it might be ascertained what happened to the ash and alleging that Reilly knew the ash had been dumped into the ocean, the indictments in this case, unlike the indictment in <u>Tonelli</u>, "set forth the precise falsehood[s] alleged and the factual basis of . . . [their] falsity with sufficient clarity to permit a jury to determine . . . [their] verity and to allow meaningful judicial review of the materiality of those falsehoods."  <u>Slawik</u>, 548 F.2d at 83.  The indictment also alleged that Reilly responded falsely when he denied having directed the dumping of the ash from the <u>Khian Sea</u>, and as the government concedes, "there was no specific averment in the . . . Wilmington indictment that Reilly had in fact directed the dumping."  <u>See</u> U.S. br. at 49.  However, unlike the questions in <u>Tonelli</u>, the grand jury's question regarding whether Reilly directed the dumping of ash was quite precise and was not

48

excerpted in the indictment in a misleading manner. Moreover, we see no evidence that Reilly's response to this question or any of the other related questions was "literally true." Thus, in the circumstances, the indictment in this case, unlike the indictment in <u>Tonelli</u>, adequately specified "in what particular the defendant's reply was false." <u>Tonelli</u>, 577 F.2d at 198.

E. <u>Was the question posed to Dowd too ambiguous to allow his response to form the basis of a false declarations conviction?</u>

Dowd appeared before a federal grand jury for the District of Delaware on February 14, 1990. <u>See</u> U.S. app. at 405–95. Based on his testimony before the grand jury, Dowd was charged with one count of knowingly making a false declaration under oath. While this count alleged that Dowd knowingly made three false declarations before the grand jury, the district court instructed the jury that a conviction required proof beyond a reasonable doubt that Dowd knowingly made only one false declaration. <u>See</u> U.S. app. at 231. The indictment listed the following three questions and allegedly false declarations:

        A GRAND JUROR: Do you know what
    happened to the ash?
        THE WITNESS: No.
        A GRAND JUROR: You have no idea?
        THE WITNESS: No, I don't. I honestly
    have not been on that ship for two and a half
    years.
                    . . .

        A GRAND JUROR: . . . [y]ou didn't ask
    where it went? You didn't want to know where
    it went?
        THE WITNESS: No, I didn't ask, and I
    don't know. All right? Nor did he tell me.

49

See D. app. at 212-13.

The jury's answers to special interrogatories indicate that it found Dowd guilty only of making a knowingly false declaration in response to the question "You have no idea?" See U.S. app. at 234-35. The jury did not return a verdict with respect to Dowd's response to the question "[d]o you know what happened to the ash?" and found Dowd "not guilty" of violating 18 U.S.C. § 1623(a) based on his response to the question "[y]ou didn't ask where it went? You didn't want to know where it went?". Like Reilly, Dowd asserts that his statement was made in response to a question that was too ambiguous to support his conviction for making a false declaration. The district court rejected this argument and so do we. See Reilly, 811 F. Supp. at 181.

As the government argues, viewed in context, the question posed to Dowd was "you have no idea [what happened to the ash]?" See U.S. br. at 51. Dowd concedes that the question "could reasonably be interpreted simply as a restatement of the preceding question," and that "[u]nder this interpretation, the question essentially asked . . . '[a]re you certain you do not know what happened to the ash?" See D. br. at 19. However, Dowd contends that the question also could be construed to call for "intelligent speculation," id. at 22, that the jury's responses to the special interrogatories confirm that this was the construction it adopted, id. at 20. He further argues that a "jury is not free to attempt to decipher which of two meanings to

50

accept," id. at 21 (citing United States v. Manapat, 928 F.2d 1097, 1101 (11th Cir. 1991)).

We conclude that the question was not "fundamentally ambiguous." First, a jury is generally free to determine the meaning the defendant ascribed to a question. As we noted above, when there is "some ambiguity[,] . . . [n]ormally, it is for the petit jury to decide which construction the defendant placed on the question." United States v. Ryan, 828 F.2d at 1015. The question posed to Dowd, like those posed to Reilly, "is not so ambiguous that it is not amenable to jury interpretation" because it is reasonable "'to expect that the defendant understood the question.'" Id. (quoting Slawik, 548 F.2d at 86). The prosecutor expressly instructed Dowd that the questions were intended to determine what he knew, and that if he didn't know something, he should "just say . . . [I] don't know." See U.S. app. at 439; see also id. at 446 ("[i]f you don't know something, tell us you don't know"). Moreover, Dowd's responses indicate that he was aware that he should respond based on his own knowledge, and that he should define his own "knowledge" to include information obtained from speaking to others.[0] See e.g., id. at 453 ("[t]o my knowledge, no"), 478-80 ("A. . . . The repair work done in Singapore, in Yugoslavia, wasn't complete

---

[0]The dissent contends that the question "You have no idea?" was "fatally ambiguous" because it "is so fundamentally ambiguous that it would be entirely unreasonable to expect that [Dowd] understood it." Dissent typescript at 23. As we stated above, we conclude that the question posed to Dowd was not "fatally ambiguous" because it is reasonable "'to expect that the defendant understood the question.'" United States v. Ryan, 828 F.2d at 1015 (citation omitted).

51

because the vessel could not complete its survey . . . [b]ecause there was ash in the cargo. . . . A GRAND JUROR: Did you just say when the ship got to Yugoslavia it still had the ash on it? THE WITNESS: I wasn't there. I was told that. Okay. Yes.").

Second, Dowd's reliance on the jury's responses to the special interrogatories is inappropriate. The jury's responses to the special interrogatories are immaterial to our inquiry because the jury was not required to make a finding regarding more than one of Dowd's three allegedly false responses, and it did <u>not</u> make a finding regarding Dowd's response to the first of the three questions identified in the false statements count. Moreover, as we pointed out in <u>United States v. Vastola</u>, 899 F.2d 211, 225 (3d Cir.), <u>cert. granted and judgment vacated on other grounds</u>, 497 U.S. 1001, 110 S.Ct. 3233 (1990), principles of estoppel do not require the verdict rendered at a single trial to be consistent. Thus, we conclude that the question on which Dowd's conviction rests was not too ambiguous to support it.

F. <u>Was Dowd's response "material"?</u>

Dowd argues that his conviction under the false declarations statute, 18 U.S.C. § 1623, should be reversed because the government failed to establish that his testimony was "material" to the grand jury's investigation. We agree with the district court's conclusion that this argument lacks merit. <u>See</u> <u>Reilly</u>, 811 F. Supp. at 180–81. Section 1623 provides in relevant part that

52

> (a) [w]hoever under oath . . . in any
> proceeding before or ancillary to any court
> or grand jury of the United States knowingly
> makes any false material declaration or makes
> or uses any other information, including any
> book, paper, document, record, recording, or
> other material, knowing the same to contain
> any false material declaration, shall be
> fined not more than $ 10,000 or imprisoned
> not more than five years or both.

Thus, "under the false declarations statute, 18 U.S.C. § 1623, materiality is an essential element of the offense and a question of law reserved for decision by the court." United States v. Crocker, 568 F.2d 1049, 1056 (3d Cir. 1977) (citing Slawik, 548 F.2d at 75, 83). "It is well established that a perjurious statement is material . . . if it has a tendency to influence, impede, or hamper the grand jury from pursuing its investigation." United States v. Lardieri, 497 F.2d 317, 319 (3d Cir. 1974), on rehearing, 506 F.2d 319 (3d Cir. 1974). Moreover, "leads to additional facts may be material even though they do not directly reflect on the ultimate issue being investigated." 497 F.2d at 319.[0] We apply a plenary standard of review to

---

[0] See also Crocker, 568 F.2d at 1057 ("it suffices to establish that testimony . . ., if false, [would] tend to impede an investigation"); United States v. Phillips, 674 F. Supp. 1144, 1148 (E.D. Pa. 1987) ("A question asked of a grand jury witness is material if it 'is such that a truthful answer could help the inquiry, or a false response hinder it, and these effects are weighed in terms of potentiality rather than probability. . . . It is of no consequence that the information sought would be merely cumulative, that the response was believed by the grand jury to be perjurious at the time it was uttered, or that the matters inquired into were collateral to the principal objective of the grand jury.'") (emphasis in original) (quoting United States v. Berardi, 629 F.2d 723, 728 (2d Cir.), cert. denied, 449 U.S. 995, 101 S.Ct. 534 (1980)); United States v. Schiavo, 375 F. Supp. 475, 477 (E.D. Pa.) ("False testimony is material if it has a natural tendency to influence the grand jury in its investigation, and there is no need to prove the perjured

53

determine whether Dowd's testimony was material as a matter of law. Slawik, 548 F.2d at 83.

According to Dowd, the government failed to satisfy the materiality requirement because the question posed to Dowd could be construed in one of two ways: (1) as a restatement of the previous question calling for knowledge that was material to the grand jury's investigation or (2) as a distinct question calling for intelligent speculation, which was not material to the grand jury's investigation. See D. br. at 24-27. Dowd analogizes this case to Slawik, and argues that Slawik requires us to hold that the government failed to satisfy the materiality requirement. However, this case is distinguishable from Slawik.

In Slawik, the defendant testified that he had given the following advice to an associate subpoenaed to testify before a grand jury:

> Look Barney [sic] you will probably only be there a day. Get yourself legal counsel, tell them the truth. They are not going to hold you. You can go back to Florida.

Slawik, 548 F.2d at 82. The court held that the defendant's conviction under section 1623 must be reversed because "[n]either the indictment nor the bill of particulars set[] forth the grand jury's understanding of . . . [the underlined] words," and thus the court could not determine "whether the trial jury found that

---

testimony actually impeded the jury's work. The false testimony need not be directed to the primary subject of the investigation, it is material if it is relevant to any subsidiary issue under consideration by the tribunal.") (citing United States v. Lococo, 450 F.2d 1196, 1199 (9th Cir. 1971), cert. denied, 406 U.S. 945, 92 S.Ct. 2040 (1972)), aff'd, 506 F.2d 1053 (3d Cir. 1974) (table).

54

. . . [the defendant] had failed actually to advise . . . [his associate]: (1) to tell counsel the truth, or (2) to tell the grand jury the truth." Id. at 83. Only the latter construction would have rendered the alleged falsehood "material," and "the imprecision of the allegations contained in the indictment and bill of particulars render[ed] meaningful review of materiality impossible." Id.

This case is distinguishable from Slawik because the indictment here set forth the meaning of Dowd's responses by specifying that Dowd's responses "were false in that . . . [he,] then and there well knew that the incinerator ash on board the Khian Sea had been discharged, disposed of and off loaded from the Khian Sea by dumping the incinerator ash into the water in and around the Indian Ocean." See D. app. at 31. Thus, the indictment did not permit the construction of the question "[y]ou have no idea [what happened to the ash]?" as a question that called for "intelligent speculation." Instead, the indictment indicated that the question was merely a restatement of the previous question regarding Dowd's "knowledge" of "what happened to the ash," and, as Dowd concedes, this question and Dowd's response to it were material to the grand jury's investigation.

G. Did the evidence support Dowd's false declaration conviction?

Dowd also argues that if we construe the question "[y]ou have no idea?" to mean "are you certain you do not know what happened to the ash?", his conviction cannot stand because

55

there was insufficient evidence indicating that he "actually knew 'what happened to the ash.'"  See D. br. at 28.  Thus, Dowd claims that there was insufficient evidence of the falsity of his statement to sustain his conviction under 18 U.S.C. § 1623.  According to Dowd, Fuentes's testimony regarding whether he discussed the disposal of the ash with Dowd was self-contradictory.  Id. at 29-31.  Dowd also argues that Fuentes's testimony regarding Dowd's instructions to tell inquiring journalists that the ash had been left in a country whose identity could not be revealed and to create a false log of the route taken by the Khian Sea does not prove that Dowd knew the ash had been dumped in the ocean.  Id. at 31-34.

"We review challenges to the sufficiency of the evidence presented at trial by ascertaining whether, viewing the evidence in the light most favorable to the government, a reasonable mind could find the defendant guilty beyond a reasonable doubt of every element of the offense."  United States v. Terselich, 885 F.2d 1094, 1097 (3d Cir. 1989).  Here we conclude, viewing the evidence in the light most favorable to the government, that a jury could have found beyond a reasonable doubt that Dowd's statement that he had no idea what happened to the ash was false.

We base our holding on several grounds.  First, Fuentes's testimony was not inherently self-contradictory.  He testified on direct that he asked Dowd "what would be happening now that we have dumped the ash to the ocean and if the journalist will be still making questions around the cargo."  See

56

D. app. at 320. He then reiterated during his cross-examination that when Dowd boarded the ship in Singapore, "I asked him, [n]ow, what we will do, what we will do now that we have dumped the ash in the ocean?". See U.S. app. at 95. It is true that Fuentes admitted having told a private investigator that he did not "tell . . . [Dowd] straight that, hey, we did . . . [the dumping] because he already knew." See D. app. at 334. However, as the government points out, the jury reasonably could have found that Fuentes's earlier statement was not in conflict with his trial testimony because "Fuentes mentioned the dumping to Dowd only as a predicate for obtaining instructions about what to tell the press. This may have been what Fuentes meant when he told the investigator that he had not told Dowd 'straight' about the dumping." See U.S. br. at 58–59. Moreover, Fuentes clarified what he had said to the private investigator about his conversation with Dowd by stating "[w]e [he and Dowd] discuss it, we talk about it, but I did not make the straight question." See D. app. at 334. Thus, we cannot conclude that as a matter of law, Fuentes's testimony was self-contradictory or that he retracted his earlier testimony about having discussed the dumping with Dowd.

Second, Fuentes's other testimony regarding Dowd supported the jury's finding that Dowd knew about the dumping. We conclude that, viewed in the light most favorable to the government, Fuentes's testimony that Dowd boarded the ship in Singapore to "pickup the gear that we had been using to discharge the ship," id. at 319–20, and instructed him to tell journalists

that the ash had been discharged in an unidentified country pursuant to an agreement, see U.S. app. at 95, D. app. at 320, and to create a false logbook documenting "another route other than the one we have been," see id. at 324-25, is sufficient to support the jury's finding that Dowd knew the ash had been dumped in the ocean.

Finally, there was evidence indicating that, as president of Coastal Carriers, Dowd played an active role in the affairs of the Khian Sea from the moment the ash was loaded, and this evidence also supports the conclusion that Dowd knew about the dumping. Dowd was present when the ash was first loaded onto the Khian Sea, see U.S. app. at 124, knew some of it was off-loaded in Haiti, id. at 125, searched for possible sites to discharge the remaining ash, id. at 118-19, met the ship in Singapore where it was to be reclassified inasmuch as its holds no longer contained any ash, and communicated with Reilly from Singapore, id. at 126. Overall, the evidence of the falsity of Dowd's statement that he had "no idea" what happened to the ash is more than sufficient to sustain his conviction under 18 U.S.C. § 1623.

## H. Did the prosecutor improperly offer his opinion and unsworn testimony during his closing argument?

Dowd and Reilly argue that the prosecutor prejudiced them in his closing argument by referring to their testimony as "lies," and by misstating the record in several respects. See D. br. at 34-37; R. br. at 60-69. Dowd and Reilly unsuccessfully

58

raised their arguments regarding the impropriety of the prosecutor's closing argument in motions for new trials. See D. app. at 42-43. Like the district court, we reject their arguments.

While it is true that the prosecutor referred to Dowd's and Reilly's testimony as "lies," in making this characterization he was not guilty of misconduct because he merely was making a "fair comment on the evidence adduced at trial." United States v. Pungitore, 910 F.2d 1084, 1127 (3d Cir. 1990), cert. denied, 111 S.Ct. 2009 (1991). Thus, although such a comment may in some instances be an inflammatory expression of a prosecutor's personal belief and require reversal, here it does not. Furthermore, the prosecutor's characterization of Dowd's and Reilly's testimony as lies referred to their statements at the grand jury and contempt proceedings, and when a prosecutor contends that a defendant in a false declaration case lied in the underlying proceedings, he merely is arguing that the evidence supports a verdict of guilty.

Dowd and Reilly also claim that the prosecutor made other improper statements during his closing argument. According to Dowd, the prosecutor's "most devastating" misstatement of the record was his assertion that Dowd played a role in ordering Fuentes to destroy the radiotelegrams. D. br. at 35. However, Dowd did not object to this statement at trial and therefore "we may review only for plain error." Pungitore, 910 F.2d at 1125-26. As we discussed above, there was substantial evidence indicating that Dowd knew about the dumping of the ash into the

59

ocean, and Fuentes testified that Dowd instructed him to falsify the ship's logs. Although Fuentes testified that Reilly ordered him to destroy the radiotelegrams, see D. app. at 327, 348, he also testified that "[t]he owners didn't want them on board. . . . They didn't want them on board," see U.S. app. at 97 (emphasis added). Moreover, the evidence indicates that Dowd and Reilly were in contact while Dowd was in Singapore. Thus, there was a basis for the inference that Dowd participated in the decision to have Fuentes destroy the radiotelegrams. In any event, even if the statement should not have been made, we see no basis to conclude that it gives rise to a supportable claim of "plain error" in light of the record as a whole. We also point out that the district court's instruction to the jury to rely on their recollection of the facts and not counsel's statements and arguments cured any possible prejudice resulting from the comment. In fact, the prosecutor said the same thing to the jury in his summation. Accordingly, we conclude that we should not reverse by reason of the prosecutor's statement that Dowd and Reilly ordered Fuentes to destroy the radiotelegrams.

Dowd and Reilly argue that the prosecutor misstated the evidence by suggesting that they personally had destroyed documents. Specifically, they challenge the prosecutor's contention that they destroyed their copies of radiotelegrams associated with the Khian Sea. See D. app. at 475. However, this contention was supported by evidence, including a letter from Coastal Carriers to the grand jury stating that "no radio logs or other logs" were in Coastal Carriers's possession, see R.

60

app. at 1264, and Fuente's testimony regarding the instructions he received to falsify the ship's log and destroy the radiotelegrams. Thus, the prosecutor merely was drawing an inference from certain pieces of evidence in the record.

Reilly also argues that the prosecutor "testified" based on non-record evidence by using the pronoun "we" when discussing Reilly's allegedly false testimony, by referring to Amalgamated and MASCO as "shells" for Reilly and Dowd, and by stating that the defendants had not called any witnesses from the radio transmitting companies because the radiotelegrams were "accurate." R. br. at 63-65. Reilly cites United States v. DiLoreto, 888 F.2d 996, 999 (3d Cir. 1989), for the proposition that these remarks "require reversal per se." In DiLoreto, we held that "a prosecutor's remarks regarding the defendant's guilt or a witness' credibility, if based on information not adduced at trial, require reversal per se." Id. at 999. We conclude that DiLoreto does not require reversal per se in this case.

The prosecutor used the pronoun "we" when arguing that the questions posed to the defendants were clear. He stated,

> [y]ou know what those words meant because they are words that are used in ordinary conversation. . . . Everybody knew what we were talking about. Everybody knew what they were talking about in that hearing in Philadelphia. They were talking about the ash on board the Khian Sea.

See R. app. at 1105. The prosecutor who made this statement also presented the matter to the grand jury in Delaware when Reilly and Dowd testified. Prior to trial, they sought to disqualify the prosecutor, based in part on the contention that he would be

61

an unsworn witness at trial. The district court, however, refused to disqualify him, stating that it assumed the prosecutor would be "very careful in the presentation of the Government's case." United States v. Reilly, Crim. Nos. 92-53-JJF, 93-8-JJF, 93-10-JJF, Memorandum Opinion at 9 (D. Del. May 7, 1993) (see R. app. at 109). Although the prosecutor's choice of words was unfortunate, the prosecutor's isolated use of the pronoun "we" did not constitute testimony based on evidence not adduced at trial. He did not say "we" or "I" knew what the defendant was talking about. He said "[e]verybody" knew what "we" were talking about. Consequently, the remark was merely an inference from evidence in the record, and thus does not require reversal per se. See DiLoreto, 888 F.2d at 999; Government of Virgin Islands v. Joseph, 770 F.2d 343, 349 (3d Cir. 1985). Furthermore, reviewing the matter to determine if there was prejudice from the prosecutor's use of words, we conclude that "[u]nder the circumstances and in light of the strong evidence of guilt . . . , we believe . . . [the court's] instructions adequately cured any prejudice that may have arisen." Joseph, id. at 349.

Reilly also faults the prosecutor for referring to Amalgamated and MASCO as "shells" used by Reilly and Dowd to conceal their involvement with the dumping operation of the Khian Sea, see R. app. at 1088, 1115-16. However, the record also supports this statement. As noted above, there is significant evidence indicating that Reilly sent radiotelegrams from Annapolis signed "AMALGAMATED" or "MASCO". Moreover, Cheryl Haye, a secretary for MASCO, testified that MASCO set up and

62

managed businesses, that she did not know of any MASCO office in Annapolis, id. at 525, that MASCO and Amalgamated shared the same post office box in the Bahamas, id. at 532, that there was no physical separation between Lily and MASCO inside the MASCO offices, id. at 527, that she signed a letter as president of Lily although she was actually a secretary for MASCO, id. at 534, and that she regularly would sign letters as president of corporations created by MASCO although she knew nothing about the companies, id. at 538-39. Clare Dobbins, a secretary in the Coastal Carriers office in Annapolis, testified that there was Lily letterhead in the Coastal Carriers office, see U.S. app. at 21, and that the check books for Coastal Carriers, Amalgamated, and the Coastal Barge Corporation were kept in the Coastal Carriers office. Id. at 22. Thus, we agree with the government's contention that "[i]t was proper to argue, based on this evidence, that the jury . . . should disregard the form of these different corporations and look instead to the substance of who was doing what." See U.S. br. at 70.

Finally, Reilly argues that the prosecutor stated that the defendants had not called any witnesses from the radio transmitting companies because the radiotelegrams were "accurate," and that this statement requires reversal of Reilly's conviction because it was based on evidence outside the record. After the jury was excused, the defendants objected to this statement. See U.S. app. at 216-19. At this point, the district court suggested that the parties stipulate that the cable companies did not have the required information to verify the

accuracy of the radiotelegrams.  Id. at 219-21.  The parties agreed on the stipulation, and the district court read it to the jury, id. at 221, 224-25.  The defendants did not raise any further objection or seek further clarification.  Id. at 225. Therefore, "[i]nasmuch as appellants did not object to the curative instruction or request additional instructions, they apparently were satisfied with the district court's response and cannot now complain that [the prosecutor's] comments gave rise to reversible error."  Pungitore, 910 F.2d at 1128.

I. Is the district court's refusal to grant Dowd a downward departure under the sentencing guidelines reviewable by this court, and if so, did the district court err in refusing to grant the departure?

Dowd sought a downward departure from the sentence range calculated under the Sentencing Guidelines.  Pursuant to 18 U.S.C. § 3553(b), Dowd argued that the court should depart downward because in his case, "there exist[] . . . aggravating or mitigating circumstances of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission."  Dowd argues that his false declarations prosecution was "atypical" because "he had nothing whatsoever to do with the underlying ocean dumping offense," and his "actual false statement itself is hopelessly technical in nature, arising as it does from the open-ended, ambiguous question 'You have no idea?'" See D. br. at 40.  Dowd also argues that a downward departure was warranted because his conviction "may well result in the suspension and debarment from all future government contracts not

64

only of Dowd personally but also of the various businesses owned by his entire family." Id. at 41.

In United States v. Denardi, 892 F.2d 269, 272 (3d Cir. 1989), we held that "we have no jurisdiction to review a district court's discretionary decision not to depart from the Guidelines." United States v. Bierley, 922 F.2d 1061, 1066 (3d Cir. 1990) (citing United States v. Denardi, 892 F.2d at 272). "However, we recognized in Denardi that when the district court's decision not to depart is predicated on the legally erroneous impression that it did not have the authority to do so, we may review that decision." Bierley, 922 F.2d at 1066. We believe that the district court denied Dowd a downward departure because it concluded that the Guidelines did not authorize it to depart. See D. app. at 505-06. Thus, we have jurisdiction to review the district court's decision, and based on our review, we conclude that its decision was correct.

Even if it is true that Dowd "had nothing whatsoever to do with the underlying ocean dumping offense," this fact alone does not establish that Dowd's false statement "differs from the norm." See U.S. Sentencing Guidelines, Ch. 1, Pt. A, note 4(b), at 5-6 (1993). As the government points out, Application Note 3 to Guidelines § 2J1.3 specifically addresses the situation where the defendant is convicted both for perjury and the "offense with respect to which he committed perjury," indicating that the Commission did not consider a conviction for perjury absent a conviction for an underlying offense to be "atypical." Further, we do not believe that his false statement was particularly

65

"technical in nature," or that it arose from an ambiguous question.

Finally, the district court was correct in concluding that the conviction's potentially harmful financial consequences for Dowd, his family, and their businesses did not justify a downward departure from the Guidelines. The Sentencing Commission's policy statement regarding the propriety of granting a downward departure based on a defendant's "vocational skills" is controlling, Guidelines § 5H1.2,[0] and this policy statement indicates that a sentencing court only should grant a downward departure on this basis in "extraordinary circumstances." See United States v. Sharapan, 13 F.3d 781, 784 (3d Cir. 1994). Our application of this policy statement in Sharapan led us to conclude that the district court erred in granting a downward departure based on its determination that the defendant's incarceration would cause his business to fail. Id. at 785–86. We based our conclusion on our determination that there was nothing extraordinary in the fact that the incarceration of a company's principal might "cause harm to the business and its employees," and that, even assuming that the business would fail as a result of the defendant's incarceration, there was "no basis for concluding that this failure would cause any extraordinary harm to society as a whole." Id. at 785.

---

[0]In Williams v. United States, 112 S.Ct. 1112, 1119 (1992), the Court held that where "a policy statement prohibits a district court from taking a specified action, the statement is an authoritative guide to the meaning of the applicable guideline." See also United States v. Gaskill, 991 F.2d 82, 85 (3d Cir. 1993).

66

Dowd alleges that his sentence will harm both his business and that of his family members. Nevertheless, the Sentencing Commission's policy statement regarding downward departures based on a defendant's vocational skills is controlling because the "principle underlying . . . [this policy statement is] that a sentencing judge may grant a downward departure based on a defendant's ability to make a work-related contribution to society only in extraordinary circumstances," id., and it follows from this principle that a court may grant a downward departure based on a defendant's relatives' abilities to make work-related contributions to society only in extraordinary circumstances. It is unfortunate that Dowd's family may suffer both personally and financially due to his conviction. However, we see nothing extraordinary in the fact that Dowd's conviction may harm not only his business interests but also those of his family members, and we are not convinced that the effects of Dowd's sentence on these businesses "are of sufficient economic importance to society to justify a departure." Id.[0]

### III. Conclusion

The judgments of conviction and sentence will be affirmed.

--------------------

[0]The Sentencing Commission's policy statement regarding the relevance of family ties and responsibilities to the granting of a downward departure also supports our decision. It provides that such factors are relevant only in "extraordinary" circumstances, Guidelines § 5H1.6, as "'[d]isruptions of the defendant's life, and the concomitant difficulties for those who depend on the defendant, are inherent in the punishment of incarceration.'" United States v. Gaskill, 991 F.2d 82, 84-85 (3d Cir. 1993) (quoting United States v. Johnson, 964 F.2d 124, 128 (2d Cir. 1992)).

United States v. Reilly –– Nos. 93-7671, 93-7673, 93-7684, 93-7685, 93-7686
and
United States v. Dowd –– No. 93-7694


GARTH, J., dissenting


I am compelled to dissent from the majority opinion as
(1) the record convinces me that Reilly is entitled to a new

trial on all charges, and (2) the record also requires that the false declaration charge against Dowd must be dismissed. I am also disturbed with the evidentiary analysis by which the majority sustains Reilly's conviction. That analysis, which in my opinion is seriously flawed, not only affects this appeal, but, because it will become the law of this circuit, it necessarily infects all future trial and appellate proceedings on which it may impact. It is for these reasons -- more fully expressed below -- that I find it necessary to part company with my colleagues in the majority.

## I.

I am in accord with the majority that: (1) there was no ambiguity in the predicate questions underlying Reilly's convictions for knowingly making false declarations in violation of 18 U.S.C. § 1623(a); (2) Reilly's false declaration indictments adequately alleged the falsity of his purportedly perjurious responses; and that (3) the disputed radiotelegrams admitted into evidence against Reilly were properly authenticated through circumstantial evidence.

I am not in accord, however, with the majority's analysis of the hearsay issues raised by Reilly. For the reasons which I will discuss in the following section, I disagree with the majority's holding that 13 of the disputed radiotelegrams transmitted to the Khian Sea were admissible as non-hearsay admissions of Reilly. In my opinion, the district court erred in admitting those radiotelegrams, and that error necessarily

69

undermined the entire trial process, thereby tainting Reilly's jury conviction on the ocean dumping violation (33 U.S.C. §1411(a)), as well as his false declaration convictions. Accordingly, rather than affirm Reilly's conviction, as the majority holds, I would reverse Reilly's conviction and remand his case to the district court for a new trial on all charges.

I also must disagree with the majority's affirmance of Dowd's conviction for knowingly making a false declaration before the federal grand jury in violation of 18 U.S.C. § 1623(a). Unlike the majority, I am not convinced that the predicate question posed to Dowd before the grand jury was unambiguous. Based on the inherent ambiguity of the question to which Dowd was found to have responded falsely, I would reverse his conviction, and I would remand to the district court for dismissal of the §1623(a) charge against Dowd. My disposition would obviate the need to address the sentencing issues raised by Dowd.

Inasmuch as I would reverse Reilly's convictions on the hearsay issue, and Dowd's conviction because of the ambiguity of the predicate question, I would not reach the improper prosecutorial comment issues raised by Reilly and Dowd. I hasten to add, however, that I would otherwise be in accord with the majority's determination that neither Reilly nor Dowd was prejudiced by the prosecutor's closing arguments to the jury, and that our holding in United States v. DiLoreto, 888 F.2d 996, 999 (3d Cir. 1989), does not require reversal per se in this case.

II.

70

I agree that the Government could establish by circumstantial evidence the authenticity of most, if not all, of the disputed radiotelegrams transmitted to and from the Khian Sea during its nearly two-year odyssey. Fed. R. Evid. 901(b)(4) (authentication can be established by "[a]ppearance, contents, substance, internal patterns, or other distinctive characteristics, taken in conjunction with other circumstances"); see also United States v. McGlory, 968 F.2d 309, 329 (3d Cir. 1992) (holding that sufficient evidence existed for the jury to find that notes were authored by the defendant, despite the government's inability to establish fully the defendant's authorship by expert opinion), cert. denied, 113 S.Ct. 1388 (1993); United States v. Addonizio, 451 F.2d 49, 71 (3d Cir. 1971) (noting that, for authentication purposes, "the connection between a message (either oral or written) and its source may be established by circumstantial evidence"), cert. denied, 405 U.S. 936 (1972).

A thorough review of the record persuades me that the Government satisfied its burden of establishing a prima facie case from which the jury could have inferred that the disputed radiotelegrams were what they purported to be, i.e., cable communications between the Khian Sea and Coastal Carriers and other onshore entities and individuals, including Reilly. As we have often said, "'the burden of proof for authentication is slight. All that is required is a foundation from which the fact-finder could legitimately infer that the evidence is what the proponent claims it to be.'" Link v. Mercedes-Benz of N. Am.

71

Inc., 788 F.2d 918, 927 (3d Cir. 1986) (quoting McQueeney v. Wilmington Trust Co., 779 F.2d 916, 928 (3d Cir. 1985)) (additional citations omitted).

Hence, I am in accord with the majority's holding that the disputed radiotelegrams were properly authenticated pursuant to Federal Rule of Evidence 901, by circumstantial evidence. See United States v. Console, 13 F.3d 641, 661 (3d Cir. 1993) ("The scope of appellate review upon this issue is confined to determining whether the admission constituted abuse of judicial discretion in determining that a prima facie case had been made out") (internal quotes and citations omitted), cert. denied, 114 S. Ct. 1660 (1994).

## A.

A showing of authenticity, however, "is not on a par with more technical evidentiary rules, such as hearsay exceptions, governing admissibility." Link, 788 F.2d at 928 (quoting United States v. Goichman, 547 F.2d 778, 784 (3d Cir. 1976)); accord McGlory, 968 F.2d at 328-329. That is because, once a prima facie showing of authenticity is made, it is the jury, and not the court, which ultimately determines the authenticity of the evidence. Id.

In contrast, the determination of whether hearsay is admissible at all is a matter of law for the court to decide, not a condition of fact subject to jury resolution. The majority's treatment of the hearsay issues raised by Reilly, however, effectively and impermissibly equates our evidentiary rules

72

governing admissibility with the slight showing required for authentication.

Contrary to the majority view, I am convinced that 13 of the incoming radiotelegrams, while properly authenticated, should not have been admitted into evidence because they contain inadmissible hearsay. See McGlory, 968 F.2d at 331 ("Notwithstanding authentication, the [documents] would still have to be excluded if the assertions in them are hearsay that does not fall under any exception to Federal Rule of Evidence 802 precluding the admissibility of hearsay.").

B.

For purposes of my analysis, I am willing to assume that the 18 outgoing radiotelegrams (i.e., those cable communications from the Khian Sea to onshore entities and individuals) were properly admitted by the district court. I therefore accept the majority's position that the messages contained in those outgoing radiotelegrams were admissible pursuant to Federal Rule of Evidence 801(d)(1) as non-hearsay prior statements of prosecution witness Captain Fuentes, and that the outgoing radiotelegrams themselves were admissible under the Rule 803(6) hearsay exception for records of regularly conducted activity. See Majority Typescript at 40-41. I also will allow that the admission of the four incoming radiotelegrams not linked to Reilly was harmless. See id. at 42.

We thus are left with 13 incoming radiotelegrams: the 12 purportedly sent to the Khian Sea by Reilly in Annapolis; and

73

the one purportedly sent by Kimon Berbillis, the shipping agent for Romo in Greece. The transmission of each of these incoming radiotelegrams involved the following three-step process: (1) a coastal station operator would receive a message from an onshore sender; (2) that operator would then note the date and time of the transmission and where the communication or message originated or was "Handed In"; and (3) the coastal station operator would then transmit that message in Morse Code to the Khian Sea, where the radioman onboard the Khian Sea would convert the incoming message from Morse Code into a typed message.

Reilly argues that the incoming radiotelegrams contained three levels of hearsay: (1) the communication between the onshore sender (the hearsay declarant) and the coastal station operator (the witness auditor); (2) the communication between the coastal station operator (the hearsay declarant) and the radio operator on the Khian Sea (the witness auditor); and (3) the radio operator's written recordation of the message. The majority concedes "that the incoming radiotelegrams to the Khian Sea were the product of [these] three out-of-court 'statements.'" Majority Typescript at 29. It concludes, however, that those three out-of-court "statements" are not inadmissible hearsay. Id. at 30. In reaching that conclusion, I suggest that the majority has put the rabbit in the hat.


C.

The majority's hearsay analysis is fundamentally flawed because it is premised on the assumption that the 12

74

radiotelegrams allegedly sent by Reilly originated in Annapolis, where Reilly lived and worked. See Majority Typescript at 7, 17, 19, 20, 21, 22, 24, 26, 27, 31, 32, 33, 34, 35, 40. Yet, the Government never adduced any evidence, apart from the disputed documents themselves, that the messages contained in the radiotelegrams had actually originated in Annapolis. Without such evidence, these radiotelegrams and all statements contained therein cannot be linked to Reilly.

There was no testimony from any of the intermediate coastal stations that the radiotelegrams were, in fact, "Handed In at ANNAPOLIS," as asserted by the coastal station operators in the radiotelegrams. No coastal station operator, employee, or representative ever testified that the originating stations, and the dates asserted in the radiotelegrams were, in fact, the originating stations from which, and the dates on which, the messages from the unidentified onshore declarants were received and/or transmitted by the coastal stations. Moreover, even though the district court acknowledged that "there may be significant transmission errors," R. app. 1297-98, there was no evidence presented that the coastal stations accurately transcribed the messages they received from the unidentified onshore declarants, or that the coastal stations accurately transmitted those messages, in Morse Code, to the Khian Sea.

Hence, the "statements" contained in the radiotelegrams can only be viewed as "[h]earsay included within hearsay." See Fed. R. Evid. 805. We have the hearsay of unidentified onshore declarants transmitted by unidentified coastal operators, who

75

also transmitted additional hearsay specifying the point of origin and the date to the Khian Sea radioman, who ultimately translated all of that hearsay from Morse Code into a written recordation.  As "[h]earsay included within hearsay," the incoming radiotelegrams thus are subject to Rule 805, which requires for admissibility that "each part of the combined statements [must] conform[] with an exception to the hearsay rule provided in these rules."  The majority's "layered approach to the hearsay analysis," see Majority Typescript at 33 n.14, does not satisfy that criterion for admissibility of the incoming radiotelegrams.

Significantly, the majority fully acknowledges that the point of origin and destination of each radiotelegram, and the date on which each radiotelegram was sent, "were introduced to prove their truth, i.e., to prove that the radiotelegrams were sent from the point of origin to the destination on the designated date."  Majority Typescript at 32.  It further recognizes that the Government did not produce a coastal station operator as a witness, thereby complicating its hearsay analysis. Id. at 32 n.14.  The majority then attempts to finesse the absence of any testimony from the coastal stations which arguably could have bridged the gap in the hearsay communications between the unidentified onshore declarants and the radioman onboard the Khian Sea.  It declares, in effect, that, while it would have been nice for the district court to have heard from a coastal station operator at trial, that testimony is not really necessary for our purposes because we can assume, through other evidence,

76

that the radiotelegrams were "handed in at Annapolis," and therefore had to come from Reilly.  I disagree.

The majority is remitted to "assembling" evidence from Captain Fuentes and Coastal Carriers' secretary, Clare Dobbins, to substantiate its theory that Reilly authored and sent the radiotelegrams from Annapolis to the Khian Sea, and that Reilly authorized Berbillis to do the same.  The difficulty with this analysis is that it necessarily must rely on the dates and places of origin of each radiotelegram.  However, no coastal station operator ever testified to those essential components of the radiotelegrams, and thus the evidence which the majority seeks to weave into a hearsay exception fails, because it lacks the critical links that only the coastal station operators could have supplied.   Hence, none of the trial evidence, set forth in the majority's opinion, established that these 12 incoming radiotelegrams actually originated in Annapolis, let alone that Reilly sent them.  See Majority Typescript at 33 nn.14 and 15, 34 n.16, 37 n.17, and 38 n.18.  Nor did it establish, as I point out later, that Reilly ever authorized Berbillis to send the 13th incoming radiotelegram.

Reilly testified at trial that anyone who knew the telex billing number for his Annapolis-based company, Coastal Carrier, could call a coastal station from anywhere in the world and send a shore-to-ship transmission, which would be identified as having originated in Annapolis.  That testimony was uncontroverted, and there was no evidence presented by the Government, apart from the radiotelegrams themselves, that it was

77

Reilly, and not someone else who knew Coastal Carriers' billing number, who sent the 12 incoming radiotelegrams which the Government attributed to Reilly.

Because, as I also point out later, the Government failed to lay the proper foundation for admission of the radiotelegrams pursuant to the business records exception of Rule 803(6),[0] and because the radiotelegrams themselves do not meet the requirements of any other exception to the hearsay rule, there is no admissible evidence establishing that the 12 radiotelegrams were sent from Annapolis. See Fed. R. Evid. 805. Consequently, the "statements" contained in those radiotelegrams -- which the majority links to Reilly through inadmissible hearsay (e.g., "Handed In at ANNAPOLIS") -- cannot be deemed admissible as non-hearsay admissions of Reilly.

Statements attributed to Reilly would, by themselves, of course, be admissible under Rule 801(d)(2)(A), which provides

---

[0] Rule 803(6) provides:

> A memorandum, report, record, or data compilation, in any form, of acts, events, conditions, opinions, or diagnoses, made at or near the time by, or from information transmitted by, a person with knowledge, if kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the memorandum, report, record, or data compilation, all as shown by the testimony of the custodian or other qualified witness, unless the source of information or the method of circumstances of preparation indicate lack of trustworthiness. The term "business" as used in this paragraph includes business, institution, association, profession, occupation, and calling of every kind, whether or not conducted for profit.

78

that a statement is not hearsay if it is offered against a party, and is the party's own statement in either an individual or representative capacity. Without the requisite foundational testimony from a coastal station representative, however, there simply is no admissible evidence establishing Reilly as the onshore declarant who transmitted the radiotelegram instructions to the Khian Sea. That being so, any "statements" allegedly made in the radiotelegrams by Reilly, either directly or indirectly, were not admissible as non-hearsay admissions of a party-opponent. See Fed. R. Evid. 805; Carden v. Westinghouse Elec. Corp., 850 F.2d 996, 1003 (3d Cir. 1988) ("That part of [the hearsay included within hearsay] which contains a reiteration of what someone told him is not admissible as an admission by party-opponent since the author of the statement is unknown.") (citation and internal quotation omitted).

By the same token, the message contained in the radiotelegram purportedly sent to the Khian Sea by Berbillis from Greece[0] is inadmissible hearsay because no coastal station operator ever established Berbillis as the onshore declarant. Id. Nor can that out-of-court statement be deemed to be an admission authorized by Reilly under Rule 801(d)(2)(C). That Rule of

---

[0] The radiotelegram purportedly sent on October 7, 1988 from Kimon Berbillis in Greece to the Khian Sea, contained the following message:

> ATT A. FUENTES PLEASE DELAY YOUR ETA UNTIL NOON OCTOBER 14 STOP TRY ARRIVE WITH 500 TONS IN ONEHOLD STOP REILLY WILL CABLE YOU INFO YOU REQUESTED STOP BEST REGARDS
> KIMON

R.app. 1214.

79

Evidence excludes from the definition of hearsay a statement introduced against a party which that party authorized another person to make concerning the subject.

Independent proof of the existence of an agency relationship and its scope would be required to show that Reilly authorized Berbillis to send any radiotelegram to the Khian Sea. See United States v. Pelullo, 964 F.2d 193, 200 n.4 (3d Cir. 1992). Contrary to the majority's position, there is no such proof to establish that Berbillis, an employee of Romo and not of Coastal Carriers, "was acting on behalf of Reilly or at his behest." See Majority Typescript at 23. The majority opinion nevertheless appears to assume that Reilly had authorized Berbillis to make the statement which appeared in the radiotelegram Berbillis allegedly sent to Captain Fuentes. However, apart from Fuentes' testimony that "Reilly told him that . . . Kimon Berbillis would give him [Fuentes] instructions," see Majority Typescript at 36, the majority points to no evidence establishing that Berbillis was authorized by Reilly to send any radiotelegram to Captain Fuentes pertaining to the ash. Nor does the majority refer us to any evidence whatsoever that links Reilly to Romo.

For the same reason that no agency relationship or authorization appears in the proofs, the "statements" of the coastal operators (i.e., time, date, and place of origin of the radiotelegrams) and the "statements" of the Khian Sea radioman (i.e., the recordation of the incoming hearsay) could not be admitted as non-hearsay authorized admissions of Reilly pursuant

80

to Rule 801(d)(2)(C), although the majority holds otherwise.  See id. at 38.

In Carden, we cautioned district courts against admitting declarations of unidentified persons into evidence. 850 F.2d at 1003.  Here, the Government failed to establish the identity of two groups of out-of-court declarants:  (1) the unidentified onshore declarants (alleged here but not proved to be Reilly in Annapolis and Berbillis in Greece) who transmitted messages to the coastal station operators; and (2) the unidentified coastal station operators who in turn transmitted those original messages in Morse Code and then added further hearsay allegedly establishing the place of origin and the date of the original message.

We also reiterated in Carden another well-established rule of law: that the proponent of evidence bears a heavy burden to satisfy trustworthiness requirements.  Id.  Significantly, the district court in the instant case recognized the "risk that the [onshore] sender may have been someone else other than Reilly." R.supp.app. 1297.  Yet, the Government never admitted any evidence, except for the inadmissible documents, that Reilly authored the statements in the radiotelegrams.  Notwithstanding that omission, the district court admitted the radiotelegrams anyway, without offering any explanation or rationale for its decision.  The majority compounds that error with its tortured hearsay analysis.

D.

The majority also fails to support its position that the statements attributed to Reilly would be admissible as non-hearsay, on the theory that those statements were not offered by the Government to prove that their substance was either true or false. The radiotelegrams were offered more than merely "'to prove the fact that the certain instructions had been given,' . . . and as circumstantial evidence of Reilly's state of mind, namely his knowledge of the ash dumping operation," as the majority holds. See Majority Typescript at 31. Regardless of the distinctions sought to be drawn by the majority between instructions and statements of fact, the "instructions" here, even if relevant to the hearsay analysis, have extraordinary hearsay implications. Compare Crawford v. Garnier, 719 F.2d 1317, 1323 (7th Cir. 1983) (affirming district court's admission into evidence of nonparty's out-of-court instructions "which carried no hearsay implications").

The "instructions" attributed to Reilly -- e.g., "ARRIVE COLOMBO . . . WITH ONLY 500 TONS BALLAST" and "DISPOSE 500 BALLAST PRIOR ARRIVAL SINGAPORE" -- are vastly different from any of the instructions or orders in the cases cited by the majority. See Majority Typescript at 31 (citing Anderson v. United States, 417 U.S. 211, 220 n.8; Crawford, 719 F.2d at 1323; United States v. Gibson, 675 F.2d 825, 833-34 (6th Cir.), cert. denied, 459 U.S. 972 (1982); United States v. Keane, 522 F.2d 534, 558 (7th Cir. 1975), cert. denied, 424 U.S. 976 (1976)). None of the instructions in the Supreme Court case of Anderson, or in the courts of appeals decisions in Crawford, Gibson, and

82

Keane, carried hearsay implications, and none was admitted in the egregious context that these "instructions," if indeed one can call them that, were admitted in the instant case.

Of even greater import, however, is the fact that the messages, even if called instructions, were nevertheless made known to the jury and could not have helped but influence the jury because of their contents. The district court never instructed the jury on how this evidence was to be considered; hence, the jury was never told that it could consider the messages attributed to Reilly only for the limited purpose of establishing that certain instructions had been given and as circumstantial evidence of Reilly's state of mind, and not as direct proof of Reilly's guilt.

We have many times expressed our disapproval of any admission of statements "which are not technically admitted for the truth of the matter asserted, whenever the matter asserted, without regard to its truth value, implies that the defendant is guilty of the crime charged." McGlory, 968 F.2d at 332. There is little doubt in my mind that the Government offered the incoming radiotelegrams to Reilly to prove, by their contents, that Reilly not only had ordered Captain Fuentes to dump the ash in the ocean, but that Reilly also lied about the ash dumping operation when he responded to questions at the contempt proceeding and again before the federal grand jury. I do not believe that our cases permit the admission of such "circumstantial evidence" of guilt. See, e.g., United States v. Reynolds, 715 F.2d 99, 103-04 (3d Cir. 1983) (holding statement

inadmissible because it was offered to "prove the truth of the assumed fact of defendant's guilt implied by its content.").

The evil in the majority's opinion is that it distorts established evidentiary jurisprudence in order to embrace the Government's actions, actions which are not authorized by any Rule of Evidence.  To accept the majority's ruling as the law of this court will affect not only Reilly; it will, in effect, dismantle the hearsay provisions of the Federal Rules of Evidence.  Despite the attempts by the majority to cabin the district court's ruling within the doctrines of Anderson and McGlory, the majority's opinion eviscerates the very safeguards that the hearsay rule and its limited exceptions were designed to protect.

The messages attributed to Reilly should not, in any event, be considered in the hearsay calculus.  That is because their admissibility is not independent of the radiotelegrams themselves.  Whatever the messages contained in the radiotelegrams, the hearsay elements of the radiotelegrams which involved the location and date of the radiotelegrams were never satisfied by competent proof.  The failure of the Government to establish through the coastal station senders' testimony that Reilly was the sender from Annapolis on the particular date created the threshold hearsay problems, and the radiotelegrams "linked" to Reilly only because of the location and date shown could not, on this record, satisfy any exception to the hearsay rule.  See Fed. R. Evid. 805.  The majority's attempt to overcome this problem, in my view, never succeeds.

84

The majority, without testimony that Reilly sent the radiotelegrams from Annapolis, seeks to gloss over this omission by what it calls "circumstantial evidence." But what evidence is disclosed in the record? None, because the coastal station operator who could have testified as to who sent the dispatchs, and from where and when they were sent, never testified at trial.

In other words, the majority would relieve the Government from the requirements of Rule 805, and of the foundational requirements of Rule 803(6), while at the same time it disregards our own jurisprudence. I could not disagree more.

E.

The Government argues that "[e]ven if the radiotelegrams were hearsay, they were properly admitted under the exception for records of regularly conducted activity." U.S.br. at 33. Despite this argument, the majority has now acknowledged that, because the coastal station operators had not testified to lay the foundation for the introduction into evidence of their "statements" pursuant to the business records exception of the hearsay rule, "the radiotelegrams were not introduced as business records of the coastal sending station." Majority Typescript at 33 n.14. The majority, apparently concerned about the admissibility of the radiotelegrams allegedly sent by Reilly and Berbillis, nonetheless finds support for their admission in the business records exception to the hearsay rule, Rule 803(6). See Majority Typescript at 38-40.

The requirements of Rule 803(6) can be shorthanded as (1) knowledge, (2) contemporaneous recordation, (3) in the

regular course of business, (4) which requires such records regularly to be kept.   There can be no question that the four foundational requirements of Rule 803(6), identified and discussed by the majority ante at ___ (Majority Typescript at 39), were not satisfied in the instant case.

Notwithstanding the testimony of the Khian Sea radio operator, Carcamo, about his documenting of the incoming radiotelegrams, those incoming radiotelegrams cannot satisfy the requirements of Rule 803(6) because no "qualified witness" for the coastal stations ever attested at trial that
> (1) the declarants in the records had knowledge to make accurate statements; (2) that the declarant[s] recorded statements contemporaneously with the actions which were the subject of the reports; (3) that the declarant[s] made the record in the regular course of the business activity; and (4) that such records were regularly kept by the business.

Console, 13 F.3d at 657 (citations and internal quotations omitted).  Without this crucial testimony from the coastal station operators, who were the intermediaries in the transmissions between the onshore declarants and Carcamo, the incoming radiotelegrams could not be admitted in evidence.

I therefore suggest that the majority's reliance on Carcamo's testimony, see Majority Transcript at 40-41, is clearly misplaced.  As I point out below, Carcamo was in no position to testify as to who the declarants were, the origin of the radiotelegrams, or the date they were transmitted by the onshore declarants.  The fact that Carcamo may have kept files of these

messages cannot supply the foundational requirements that only the coastal station operators could have furnished.

Rule 803(6) requires each person transmitting recorded information to "verify the information provided, or [else] the information transmitted [must meet] the requirements of another hearsay exception, Fed.R.Evid. 805." Console, 13 F.3d at 657. No coastal station operator ever verified the "statements" contained in the radiotelegrams, and those "statements" ultimately recorded by Carcamo onboard the Khian Sea were inadmissible because they do not satisfy the requirements of any other exception to the hearsay rule. See Fed. R. Evid. 805.

The principal precondition to admission of documents as business records is that the records have sufficient indicia of trustworthiness to be considered reliable. Fed. R. Evid. 803(6) (authorizing admission of records of regularly conducted activities "unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness.") (emphasis added). Here, the record reveals that the precondition of trustworthiness was not satisfied. The only evidence even remotely bearing on this issue was Carcamo's testimony that he never had any complaints about the accuracy of his translation of Morse Code. Carcamo did not, and could not, testify about the accuracy of the coastal station operators' translation of the original message into Morse Code and their transmissions of those coded messages to the Khian Sea, let alone concerning "the source of information," as required by Rule 803(6).

87

Indeed, the district court explicitly recognized that "there may be significant transmission errors in particular documents," R. supp. app. 1297-28, and the Government never presented any evidence from the coastal station operators to quell that concern. For this reason alone, the incoming radiotelegrams themselves could not be admitted under the business records exception to the hearsay rule. See United States v. Nixon, 779 F.2d 126, 134 (2d Cir. 1985) (holding that telex containing many inaccuracies failed to satisfy requirements of Rule 803(6)).

## F.

For all of the reasons which I have discussed -- i.e., no proof that the radiotelegrams were sent by or authorized by Reilly, and no foundation for their admission under any exception to the hearsay rule, including the business records exception --I would hold that the 12 incoming radiotelegrams purportedly sent to the Khian Sea by Reilly from Annapolis, the one radiotelegram purportedly sent by Berbillis from Greece, and all statements contained therein, were erroneously admitted into evidence by the district court.

There is no question in my mind that the erroneous admission of the 13 radiotelegrams was not harmless error. That evidence was crucial to the Government's case against Reilly. It alone corroborated Captain Fuentes' testimony that Reilly ordered the Khian Sea crew to dump the ash in the ocean, and that Reilly thus knew that the ash had been dumped in the ocean. Indeed, the

88

Government indicated to the jury that the radiotelegrams, and not the testimony of Captain Fuentes, was "the" evidence against Reilly.  R.app. 1109.[0]

Because those 13 incoming radiotelegrams were enormously prejudicial to Reilly, I would hold that it was reversible error for the district court to admit them into evidence.  Accordingly, I would reverse Reilly's convictions on all charges, and I would remand his case to the district court for a new trial.

## III.

I also believe that the majority errs in holding that the predicate question forming the basis for Dowd's conviction for knowingly making a false declaration before the federal grand jury was not fatally ambiguous.  Rather, I am convinced that a reversal and a remand for dismissal of the false declaration

---

[0]  In his summation to the jury, the prosecutor urged: "Ladies and gentlemen, look at the cables, this is the evidence." R.app. 1109.  The prosecutor further argued that:

> Captain Fuentes is not the key witness in this case.  All of the evidence is what I am asking and I submit to you what you need to consider . . . .  Not anyone, not anyone could have filled those cables out.  When you read them, read through them and see how they fit together very well.  See how they show what was going on at the time.

R.app. 1117-18.  While acknowledging that the Government bore the burden of proof at trial, the prosecutor also told the jury that, "I guarantee you one thing, if [Reilly] had anything to say that would have discredited those cables, [he] would have brought them. . . . [Reilly] didn't bring them because the cables are accurate."  R.app. 1122.

89

charge against Dowd is required because the question which he is alleged to have answered falsely is so fundamentally ambiguous that it would be entirely unreasonable to expect that he understood it.  United States v. Ryan, 828 F.2d 1010, 1015 (3d Cir. 1987); United States v. Slawik, 548 F.2d 75, 86 (3d Cir. 1977).

Before the federal grand jury, the following exchange took place:

```
A GRAND JUROR: Do you know what happened to the ash?
[DOWD]:        No.
A GRAND JUROR: You have no idea?
[DOWD]:        No, I don't.  I honestly have not been
               on that ship for two and a half years. *
               * *
A GRAND JUROR: Seeing how you had all this concern of
               not being able to unload this ash, you
               didn't ask anybody where it went:
[DOWD]:        Who is there to ask?
A GRAND JUROR: I guess you could start with asking the
               captain.  He ought to know where it
               went.
[DOWD]:        They say -- he's a funny guy.  The first
               time I met him.  Honduran person.  He
               said "The ash is gone."  And I said --
A GRAND JUROR: Just said good, but you didn't ask where
               it went?  You didn't want to know where
               it went?
[DOWD]:        No, I didn't ask and I don't know.  All
               right?  Nor did he tell me.
```

(D. app. 475-76 (emphasis added.)

At trial, the jury was asked to answer special interrogatories with respect to the above-quoted testimony. Specifically, it was asked to decide the truth or falsity of Dowd's negative responses to each of the following distinct questions:

(1) "Do you know what happened to the ash?"

90

(2) "You have no idea?"

(3) "[Y]ou didn't ask where it went?  You didn't want to know where it went?"

The jury acquitted Dowd of giving false testimony in response to question (3); that is, the jury found that Dowd did not ask where the ash went and did not want to know where the ash went.  The jury did not return a verdict on question (1); thus it never decided whether Dowd answered falsely when he testified before the grand jury that he did not know what happened to the ash.  With respect to question (2), the jury found that Dowd violated 18 U.S.C. § 1623(a) by falsely stating, "No, I don't," in response to the question, "You have no idea?"

While I agree with the majority that a jury is "generally free to determine the meaning the defendant ascribed to a question," I cannot agree with the majority's conclusion that the question "You have no idea?" is amenable to jury interpretation.  See Majority Typescript at 50.  The Government concedes that "if viewed in isolation, that question would be fatally ambiguous."  U.S. br. at 50.  Unlike the majority, however, I am not persuaded by the Government's argument that the ambiguity issue can be resolved in its favor and against Dowd because "'viewed in context, the question posed to Dowd was 'you have no idea [what happened to the ash]?'"  See Majority Typescript at 49 (quoting U.S. br. at 51).

In my opinion, the question "You have no idea?" not only is imprecise and vague, it is susceptible to at least two possible meanings.  That much is evident by the equally plausible

91

constructions urged by Dowd and by the Government.  As the Government argues, the question could be viewed as asking Dowd, "Are you certain that you have no knowledge of what happened to the ash?"  Or, as Dowd contends, the question can be viewed as asking whether Dowd had "any idea -- however far it may fall short of actual knowledge -- concerning what happened to the ash?"  D. rp.br. at 3-4.

It is impossible to say that "'men of ordinary intellect could agree'" about the meaning of the question, "You have no idea?"  See Ryan, 828 F.2d at 1015, 1017 (citations omitted).  That question can just as easily be understood to be asking whether Dowd had any actual knowledge of what happened to the ash, as it could be understood as asking Dowd whether he had any idea whatsoever about what happened to the ash, as Dowd contends.

Although the majority indicates otherwise, see majority typescript at 49, the district court never rejected Dowd's argument that the question, "You have no idea?" was fatally ambiguous.[0]  To the contrary, in granting Dowd a stay of sentence

---

[0] Before trial, the district court rejected Dowd's motion to dismiss the false declaration count on the ground that it was based on questions and answers too ambiguous or vague so as to be legally insufficient to support a perjury conviction.  In doing so, the district court focused only on two of the three questions later submitted to the jury:  "Do you know what happened to the ash?" and "[Y]ou didn't ask where it went?  You didn't want to know where it went?"  United States v. Reilly, 811 F. Supp. 177, 180 (D. Del. 1993).  The district court never even considered the ambiguity of the question "You have no idea?" -- the only question which Dowd was convicted of answering falsely.  See id. at 180-181.

92

pending appeal, the district court recognized that "there is a substantial question about the ambiguity and the materiality of the question and answer that was the subject of the perjury conviction." R. app. 302. I, too, believe that there is a substantial question about the ambiguity and materiality of the predicate question, and I would hold that that question must be resolved in favor of Dowd. See Ryan, 828 F.2d at 1015; Slawik, 548 F.2d at 86. I do not address materiality because the patent ambiguity of the question to which Dowd responded obviates any need to go beyond the issue of ambiguousness. Slawik, 548 F.2d at 86.

Because of the inherent ambiguity of the question "You have no idea," I do not believe that the jury should have been allowed to consider Dowd's answer to that question as a possible basis for conviction of the false swearing charge. See Ryan, 828 F.2d at 1017. Accordingly, I would reverse Dowd's conviction for knowingly answering that question falsely before the grand jury, and I would not even reach the issue Dowd raises concerning the materiality of that question.

### IV.

I again emphasize my concern that the majority's unfortunate "hearsay" analysis, which results in sustaining Reilly's conviction, will have ramifications that will extend far beyond the confines of this appeal, so long as it remains the law of this circuit.

For the reasons which I have expressed in the foregoing opinion, I respectfully dissent from the majority's affirmance of

93

the judgments of conviction and sentence against both Reilly and

Dowd.